VERNONIA SCHOOL DISTRICT 47J *v.* ACTON
ET UX., GUARDIANS AD LITEM FOR ACTON

No. 94–590. Argued March 28, 1995—Decided June 26, 1995

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and KENNEDY, THOMAS, GINSBURG, and BREYER, JJ., joined. GINSBURG, J., filed a concurring opinion, *post*, p. 666. O'CONNOR, J., filed a dissenting opinion, in which STEVENS and SOUTER, JJ., joined, *post*, p. 666.

*Timothy R. Volpert* argued the cause for petitioner. With him on the briefs was *Claudia Larkins.*

*Richard H. Seamon* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Bender, Leonard Schaitman,* and *Edward Himmelfarb.*

*Thomas M. Christ* argued the cause for respondents. With him on the brief were *John A. Wittmayer* and *Steven R. Shapiro.**

JUSTICE SCALIA delivered the opinion of the Court.

The Student Athlete Drug Policy adopted by School District 47J in the town of Vernonia, Oregon, authorizes random urinalysis drug testing of students who participate in the District's school athletics programs. We granted certiorari to decide whether this violates the Fourth and Fourteenth Amendments to the United States Constitution.

## I

### A

Petitioner Vernonia School District 47J (District) operates one high school and three grade schools in the logging community of Vernonia, Oregon. As elsewhere in small-town America, school sports play a prominent role in the town's life, and student athletes are admired in their schools and in the community.

Drugs had not been a major problem in Vernonia schools. In the mid-to-late 1980's, however, teachers and administrators observed a sharp increase in drug use. Students began to speak out about their attraction to the drug culture, and to boast that there was nothing the school could do about it. Along with more drugs came more disciplinary problems.

---

*Briefs of *amici curiae* urging reversal were filed for the American Alliance for Rights & Responsibilities by *Steven P. Fulton* and *Robert Teir;* for the California Interscholastic Federation by *Andrew Patterson;* for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson;* for the Institute for a Drug-Free Workplace by *Benjamin W. Hahn;* for the National League of Cities et al. by *Richard Ruda* and *Lee Fennell;* for the National School Boards Association by *Gwendolyn H. Gregory, August W. Steinhilber,* and *Thomas A. Shannon;* for Paradise Valley Unified School District No. 69 by *Thomas C. Horne;* and for the Washington Legal Foundation et al. by *Richard K. Willard, Daniel J. Popeo,* and *David A. Price.*

Between 1988 and 1989 the number of disciplinary referrals in Vernonia schools rose to more than twice the number reported in the early 1980's, and several students were suspended. Students became increasingly rude during class; outbursts of profane language became common.

Not only were student athletes included among the drug users but, as the District Court found, athletes were the leaders of the drug culture. 796 F. Supp. 1354, 1357 (Ore. 1992). This caused the District's administrators particular concern, since drug use increases the risk of sports-related injury. Expert testimony at the trial confirmed the deleterious effects of drugs on motivation, memory, judgment, reaction, coordination, and performance. The high school football and wrestling coach witnessed a severe sternum injury suffered by a wrestler, and various omissions of safety procedures and misexecutions by football players, all attributable in his belief to the effects of drug use.

Initially, the District responded to the drug problem by offering special classes, speakers, and presentations designed to deter drug use. It even brought in a specially trained dog to detect drugs, but the drug problem persisted. According to the District Court:

> "[T]he administration was at its wits end and . . . a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion. Disciplinary actions had reached 'epidemic proportions.' The coincidence of an almost three-fold increase in classroom disruptions and disciplinary reports along with the staff's direct observations of students using drugs or glamorizing drug and alcohol use led the administration to the inescapable conclusion that the rebellion was being fueled by alcohol and drug abuse as well as the student's misperceptions about the drug culture." *Ibid.*

At that point, District officials began considering a drug-testing program. They held a parent "input night" to dis-

cuss the proposed Student Athlete Drug Policy (Policy), and the parents in attendance gave their unanimous approval. The school board approved the Policy for implementation in the fall of 1989. Its expressed purpose is to prevent student athletes from using drugs, to protect their health and safety, and to provide drug users with assistance programs.

## B

The Policy applies to all students participating in interscholastic athletics. Students wishing to play sports must sign a form consenting to the testing and must obtain the written consent of their parents. Athletes are tested at the beginning of the season for their sport. In addition, once each week of the season the names of the athletes are placed in a "pool" from which a student, with the supervision of two adults, blindly draws the names of 10% of the athletes for random testing. Those selected are notified and tested that same day, if possible.

The student to be tested completes a specimen control form which bears an assigned number. Prescription medications that the student is taking must be identified by providing a copy of the prescription or a doctor's authorization. The student then enters an empty locker room accompanied by an adult monitor of the same sex. Each boy selected produces a sample at a urinal, remaining fully clothed with his back to the monitor, who stands approximately 12 to 15 feet behind the student. Monitors may (though do not always) watch the student while he produces the sample, and they listen for normal sounds of urination. Girls produce samples in an enclosed bathroom stall, so that they can be heard but not observed. After the sample is produced, it is given to the monitor, who checks it for temperature and tampering and then transfers it to a vial.

The samples are sent to an independent laboratory, which routinely tests them for amphetamines, cocaine, and marijuana. Other drugs, such as LSD, may be screened at the

request of the District, but the identity of a particular student does not determine which drugs will be tested. The laboratory's procedures are 99.94% accurate. The District follows strict procedures regarding the chain of custody and access to test results. The laboratory does not know the identity of the students whose samples it tests. It is authorized to mail written test reports only to the superintendent and to provide test results to District personnel by telephone only after the requesting official recites a code confirming his authority. Only the superintendent, principals, vice-principals, and athletic directors have access to test results, and the results are not kept for more than one year.

If a sample tests positive, a second test is administered as soon as possible to confirm the result. If the second test is negative, no further action is taken. If the second test is positive, the athlete's parents are notified, and the school principal convenes a meeting with the student and his parents, at which the student is given the option of (1) participating for six weeks in an assistance program that includes weekly urinalysis, or (2) suffering suspension from athletics for the remainder of the current season and the next athletic season. The student is then retested prior to the start of the next athletic season for which he or she is eligible. The Policy states that a second offense results in automatic imposition of option (2); a third offense in suspension for the remainder of the current season and the next two athletic seasons.

### C

In the fall of 1991, respondent James Acton, then a seventh grader, signed up to play football at one of the District's grade schools. He was denied participation, however, because he and his parents refused to sign the testing consent forms. The Actons filed suit, seeking declaratory and injunctive relief from enforcement of the Policy on the grounds that it violated the Fourth and Fourteenth Amendments to the United States Constitution and Article I, § 9, of the Ore-

gon Constitution. After a bench trial, the District Court entered an order denying the claims on the merits and dismissing the action. 796 F. Supp., at 1355. The United States Court of Appeals for the Ninth Circuit reversed, holding that the Policy violated both the Fourth and Fourteenth Amendments and Article I, § 9, of the Oregon Constitution. 23 F. 3d 1514 (1994). We granted certiorari. 513 U. S. 1013 (1994).

## II

The Fourth Amendment to the United States Constitution provides that the Federal Government shall not violate "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." We have held that the Fourteenth Amendment extends this constitutional guarantee to searches and seizures by state officers, *Elkins* v. *United States*, 364 U. S. 206, 213 (1960), including public school officials, *New Jersey* v. *T. L. O.*, 469 U. S. 325, 336–337 (1985). In *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 617 (1989), we held that state-compelled collection and testing of urine, such as that required by the Policy, constitutes a "search" subject to the demands of the Fourth Amendment. See also *Treasury Employees* v. *Von Raab*, 489 U. S. 656, 665 (1989).

As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness." At least in a case such as this, where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted,[1] whether a particular search meets the reasonableness standard " 'is judged by balancing

---

[1] Not until 1852 did Massachusetts, the pioneer in the "common school" movement, enact a compulsory school-attendance law, and as late as the 1870's only 14 States had such laws. R. Butts, Public Education in the United States From Revolution to Reform 102–103 (1978); 1 Children and Youth in America 467–468 (R. Bremner ed. 1970). The drug problem, and the technology of drug testing, are of course even more recent.

its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Skinner, supra,* at 619 (quoting *Delaware* v. *Prouse,* 440 U. S. 648, 654 (1979)). Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, this Court has said that reasonableness generally requires the obtaining of a judicial warrant, *Skinner, supra,* at 619. Warrants cannot be issued, of course, without the showing of probable cause required by the Warrant Clause. But a warrant is not required to establish the reasonableness of *all* government searches; and when a warrant is not required (and the Warrant Clause therefore not applicable), probable cause is not invariably required either. A search unsupported by probable cause can be constitutional, we have said, "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin* v. *Wisconsin,* 483 U. S. 868, 873 (1987) (internal quotation marks omitted).

We have found such "special needs" to exist in the public school context. There, the warrant requirement "would unduly interfere with the maintenance of the swift and informal disciplinary procedures [that are] needed," and "strict adherence to the requirement that searches be based on probable cause" would undercut "the substantial need of teachers and administrators for freedom to maintain order in the schools." *T. L. O.,* 469 U. S., at 340, 341. The school search we approved in *T. L. O.,* while not based on probable cause, *was* based on individualized *suspicion* of wrongdoing. As we explicitly acknowledged, however, "'the Fourth Amendment imposes no irreducible requirement of such suspicion,'" *id.,* at 342, n. 8 (quoting *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 560–561 (1976)). We have upheld suspicionless searches and seizures to conduct drug testing of railroad personnel involved in train accidents, see *Skinner, supra;* to conduct random drug testing of federal customs officers who carry arms or are involved in drug interdiction,

see *Von Raab, supra;* and to maintain automobile check-points looking for illegal immigrants and contraband, *Martinez-Fuerte, supra,* and drunk drivers, *Michigan Dept. of State Police* v. *Sitz,* 496 U. S. 444 (1990).

## III

The first factor to be considered is the nature of the privacy interest upon which the search here at issue intrudes. The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as "legitimate." *T. L. O.,* 469 U. S., at 338. What expectations are legitimate varies, of course, with context, *id.,* at 337, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park. In addition, the legitimacy of certain privacy expectations vis-à-vis the State may depend upon the individual's legal relationship with the State. For example, in *Griffin, supra,* we held that, although a "probationer's home, like anyone else's, is protected by the Fourth Amendmen[t]," the supervisory relationship between probationer and State justifies "a degree of impingement upon [a probationer's] privacy that would not be constitutional if applied to the public at large." 483 U. S., at 873, 875. Central, in our view, to the present case is the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster.

Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, *i. e.,* the right to come and go at will. They are subject, even as to their physical freedom, to the control of their parents or guardians. See 59 Am. Jur. 2d, Parent and Child § 10 (1987). When parents place minor children in private schools for their education, the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them. In fact, the tutor or schoolmas-

ter is the very prototype of that status. As Blackstone describes it, a parent "may . . . delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is then *in loco parentis*, and has such a portion of the power of the parent committed to his charge, viz. that of restraint and correction, as may be necessary to answer the purposes for which he is employed." 1 W. Blackstone, Commentaries on the Laws of England 441 (1769).

In *T. L. O.* we rejected the notion that public schools, like private schools, exercise only parental power over their students, which of course is not subject to constitutional constraints. 469 U. S., at 336. Such a view of things, we said, "is not entirely 'consonant with compulsory education laws,'" *ibid.* (quoting *Ingraham* v. *Wright*, 430 U. S. 651, 662 (1977)), and is inconsistent with our prior decisions treating school officials as state actors for purposes of the Due Process and Free Speech Clauses, *T. L. O., supra,* at 336. But while denying that the State's power over schoolchildren is formally no more than the delegated power of their parents, *T. L. O.* did not deny, but indeed emphasized, that the nature of that power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults. "[A] proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." 469 U. S., at 339. While we do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional "duty to protect," see *DeShaney* v. *Winnebago County Dept. of Social Servs.*, 489 U. S. 189, 200 (1989), we have acknowledged that for many purposes "school authorities ac[t] *in loco parentis,*" *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 684 (1986), with the power and indeed the duty to "inculcate the habits and manners of civility," *id.*, at 681 (internal quotation marks omitted). Thus, while children assuredly do not "shed their constitutional

rights . . . at the schoolhouse gate," *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 506 (1969), the nature of those rights is what is appropriate for children in school. See, *e. g., Goss* v. *Lopez*, 419 U. S. 565, 581–582 (1975) (due process for a student challenging disciplinary suspension requires only that the teacher "informally discuss the alleged misconduct with the student minutes after it has occurred"); *Fraser, supra,* at 683 ("[I]t is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse"); *Hazelwood School Dist.* v. *Kuhlmeier,* 484 U. S. 260, 273 (1988) (public school authorities may censor school-sponsored publications, so long as the censorship is "reasonably related to legitimate pedagogical concerns"); *Ingraham, supra,* at 682 ("Imposing additional administrative safeguards [upon corporal punishment] . . . would . . . entail a significant intrusion into an area of primary educational responsibility").

Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere; the "reasonableness" inquiry cannot disregard the schools' custodial and tutelary responsibility for children. For their own good and that of their classmates, public school children are routinely required to submit to various physical examinations, and to be vaccinated against various diseases. According to the American Academy of Pediatrics, most public schools "provide vision and hearing screening and dental and dermatological checks. . . . Others also mandate scoliosis screening at appropriate grade levels." Committee on School Health, American Academy of Pediatrics, School Health: A Guide for Health Professionals 2 (1987). In the 1991–1992 school year, all 50 States required public school students to be vaccinated against diphtheria, measles, rubella, and polio. U. S. Dept. of Health & Human Services, Public Health Service, Centers for Disease Control, State Immunization Requirements 1991–1992, p. 1. Particularly with regard to medical examinations and proce-

dures, therefore, "students within the school environment have a lesser expectation of privacy than members of the population generally." *T. L. O., supra,* at 348 (Powell, J., concurring).

Legitimate privacy expectations are even less with regard to student athletes. School sports are not for the bashful. They require "suiting up" before each practice or event, and showering and changing afterwards. Public school locker rooms, the usual sites for these activities, are not notable for the privacy they afford. The locker rooms in Vernonia are typical: No individual dressing rooms are provided; shower heads are lined up along a wall, unseparated by any sort of partition or curtain; not even all the toilet stalls have doors. As the United States Court of Appeals for the Seventh Circuit has noted, there is "an element of 'communal undress' inherent in athletic participation," *Schaill by Kross* v. *Tippecanoe County School Corp.,* 864 F. 2d 1309, 1318 (1988).

There is an additional respect in which school athletes have a reduced expectation of privacy. By choosing to "go out for the team," they voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally. In Vernonia's public schools, they must submit to a preseason physical exam (James testified that his included the giving of a urine sample, App. 17), they must acquire adequate insurance coverage or sign an insurance waiver, maintain a minimum grade point average, and comply with any "rules of conduct, dress, training hours and related matters as may be established for each sport by the head coach and athletic director with the principal's approval." Record, Exh. 2, p. 30, ¶ 8. Somewhat like adults who choose to participate in a "closely regulated industry," students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy. See *Skinner,* 489 U. S., at 627; *United States* v. *Biswell,* 406 U. S. 311, 316 (1972).

## IV

Having considered the scope of the legitimate expectation of privacy at issue here, we turn next to the character of the intrusion that is complained of. We recognized in *Skinner* that collecting the samples for urinalysis intrudes upon "an excretory function traditionally shielded by great privacy." 489 U. S., at 626. We noted, however, that the degree of intrusion depends upon the manner in which production of the urine sample is monitored. *Ibid.* Under the District's Policy, male students produce samples at a urinal along a wall. They remain fully clothed and are only observed from behind, if at all. Female students produce samples in an enclosed stall, with a female monitor standing outside listening only for sounds of tampering. These conditions are nearly identical to those typically encountered in public restrooms, which men, women, and especially schoolchildren use daily. Under such conditions, the privacy interests compromised by the process of obtaining the urine sample are in our view negligible.

The other privacy-invasive aspect of urinalysis is, of course, the information it discloses concerning the state of the subject's body, and the materials he has ingested. In this regard it is significant that the tests at issue here look only for drugs, and not for whether the student is, for example, epileptic, pregnant, or diabetic. See *id.*, at 617. Moreover, the drugs for which the samples are screened are standard, and do not vary according to the identity of the student. And finally, the results of the tests are disclosed only to a limited class of school personnel who have a need to know; and they are not turned over to law enforcement authorities or used for any internal disciplinary function. 796 F. Supp., at 1364; see also 23 F. 3d, at 1521.[2]

---

[2] Despite the fact that, like routine school physicals and vaccinations—which the dissent apparently finds unobjectionable even though they "are both blanket searches of a sort," *post*, at 682—the search here is undertaken for prophylactic and distinctly *non*punitive purposes (protecting

Respondents argue, however, that the District's Policy is in fact more intrusive than this suggests, because it requires the students, if they are to avoid sanctions for a falsely positive test, to identify *in advance* prescription medications they are taking. We agree that this raises some cause for concern. In *Von Raab*, we flagged as one of the salutary features of the Customs Service drug-testing program the fact that employees were not required to disclose medical information unless they tested positive, and, even then, the information was supplied to a licensed physician rather than to the Government employer. See *Von Raab*, 489 U. S., at 672–673, n. 2. On the other hand, we have never indicated that requiring advance disclosure of medications is *per se* unreasonable. Indeed, in *Skinner* we held that it was not "a significant invasion of privacy." 489 U. S., at 626, n. 7. It can be argued that, in *Skinner*, the disclosure went only to the medical personnel taking the sample, and the Government personnel analyzing it, see *id.*, at 609, but see *id.*, at 610 (railroad personnel responsible for forwarding the sample, and presumably accompanying information, to the Government's testing lab); and that disclosure to teachers and coaches—to persons who personally *know* the student—is a greater invasion of privacy. Assuming for the sake of argu-

student athletes from injury, and deterring drug use in the student population), see 796 F. Supp., at 1363, the dissent would nonetheless lump this search together with "evidentiary" searches, which generally require probable cause, see *supra*, at 653, because, from the student's perspective, the test may be "regarded" or "understood" as punishment, *post*, at 683–684. In light of the District Court's findings regarding the purposes and consequences of the testing, any such perception is by definition an irrational one, which is protected nowhere else in the law. In any event, our point is not, as the dissent apparently believes, *post*, at 682–683, that *since* student vaccinations and physical exams are constitutionally reasonable, student drug testing must be so as well; but rather that, by reason of those prevalent practices, public school children in general, and student athletes in particular, have a diminished expectation of privacy. See *supra*, at 656–657.

ment that both those propositions are true, we do not believe they establish a difference that respondents are entitled to rely on here.

The General Authorization Form that respondents refused to sign, which refusal was the basis for James's exclusion from the sports program, said only (in relevant part): "I . . . authorize the Vernonia School District to conduct a test on a urine specimen which I provide to test for drugs and/or alcohol use. I also authorize the release of information concerning the results of such a test to the Vernonia School District and to the parents and/or guardians of the student." App. 10–11. While the practice of the District seems to have been to have a school official take medication information from the student at the time of the test, see *id.*, at 29, 42, that practice is not set forth in, or required by, the Policy, which says simply: "Student athletes who . . . are or have been taking prescription medication must provide verification (either by a copy of the prescription or by doctor's authorization) prior to being tested." *Id.*, at 8. It may well be that, if and when James was selected for random testing at a time that he was taking medication, the School District would have permitted him to provide the requested information in a confidential manner—for example, in a sealed envelope delivered to the testing lab. Nothing in the Policy contradicts that, and when respondents choose, in effect, to challenge the Policy on its face, we will not assume the worst. Accordingly, we reach the same conclusion as in *Skinner:* that the invasion of privacy was not significant.

## V

Finally, we turn to consider the nature and immediacy of the governmental concern at issue here, and the efficacy of this means for meeting it. In both *Skinner* and *Von Raab*, we characterized the government interest motivating the search as "compelling." *Skinner, supra,* at 628 (interest in preventing railway accidents); *Von Raab, supra,* at 670 (in-

terest in ensuring fitness of customs officials to interdict drugs and handle firearms). Relying on these cases, the District Court held that because the District's program also called for drug testing in the absence of individualized suspicion, the District "must demonstrate a 'compelling need' for the program." 796 F. Supp., at 1363. The Court of Appeals appears to have agreed with this view. See 23 F. 3d, at 1526. It is a mistake, however, to think that the phrase "compelling state interest," in the Fourth Amendment context, describes a fixed, minimum quantum of governmental concern, so that one can dispose of a case by answering in isolation the question: Is there a compelling state interest here? Rather, the phrase describes an interest that appears *important enough* to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy. Whether that relatively high degree of government concern is necessary in this case or not, we think it is met.

That the nature of the concern is important—indeed, perhaps compelling—can hardly be doubted. Deterring drug use by our Nation's schoolchildren is at least as important as enhancing efficient enforcement of the Nation's laws against the importation of drugs, which was the governmental concern in *Von Raab, supra,* at 668, or deterring drug use by engineers and trainmen, which was the governmental concern in *Skinner, supra,* at 628. School years are the time when the physical, psychological, and addictive effects of drugs are most severe. "Maturing nervous systems are more critically impaired by intoxicants than mature ones are; childhood losses in learning are lifelong and profound"; "children grow chemically dependent more quickly than adults, and their record of recovery is depressingly poor." Hawley, The Bumpy Road to Drug-Free Schools, 72 Phi Delta Kappan 310, 314 (1990). See also Estroff, Schwartz, & Hoffmann, Adolescent Cocaine Abuse: Addictive Potential, Behavioral and Psychiatric Effects, 28 Clinical Pediatrics 550

(Dec. 1989); Kandel, Davies, Karus, & Yamaguchi, The Consequences in Young Adulthood of Adolescent Drug Involvement, 43 Arch. Gen. Psychiatry 746 (Aug. 1986). And of course the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted. In the present case, moreover, the necessity for the State to act is magnified by the fact that this evil is being visited not just upon individuals at large, but upon children for whom it has undertaken a special responsibility of care and direction. Finally, it must not be lost sight of that this program is directed more narrowly to drug use by school athletes, where the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high. Apart from psychological effects, which include impairment of judgment, slow reaction time, and a lessening of the perception of pain, the particular drugs screened by the District's Policy have been demonstrated to pose substantial physical risks to athletes. Amphetamines produce an "artificially induced heart rate increase, [p]eripheral vasoconstriction, [b]lood pressure increase, and [m]asking of the normal fatigue response," making them a "very dangerous drug when used during exercise of any type." Hawkins, Drugs and Other Ingesta: Effects on Athletic Performance, in H. Appenzeller, Managing Sports and Risk Management Strategies 90, 90–91 (1993). Marijuana causes "[i]rregular blood pressure responses during changes in body position," "[r]eduction in the oxygen-carrying capacity of the blood," and "[i]nhibition of the normal sweating responses resulting in increased body temperature." *Id.*, at 94. Cocaine produces "[v]asoconstriction[,] [e]levated blood pressure," and "[p]ossible coronary artery spasms and myocardial infarction." *Ibid.*

As for the immediacy of the District's concerns: We are not inclined to question—indeed, we could not possibly find clearly erroneous—the District Court's conclusion that "a large segment of the student body, particularly those in-

volved in interscholastic athletics, was in a state of rebellion," that "[d]isciplinary actions had reached 'epidemic proportions,'" and that "the rebellion was being fueled by alcohol and drug abuse as well as by the student's misperceptions about the drug culture." 796 F. Supp., at 1357. That is an immediate crisis of greater proportions than existed in *Skinner*, where we upheld the Government's drug-testing program based on findings of drug use by railroad employees nationwide, without proof that a problem existed on the particular railroads whose employees were subject to the test. See *Skinner*, 489 U. S., at 607. And of much greater proportions than existed in *Von Raab*, where there was no documented history of drug use by any customs officials. See *Von Raab*, 489 U. S., at 673; *id.*, at 683 (SCALIA, J., dissenting).

As to the efficacy of this means for addressing the problem: It seems to us self-evident that a drug problem largely fueled by the "role model" effect of athletes' drug use, and of particular danger to athletes, is effectively addressed by making sure that athletes do not use drugs. Respondents argue that a "less intrusive means to the same end" was available, namely, "drug testing on suspicion of drug use." Brief for Respondents 45–46. We have repeatedly refused to declare that only the "least intrusive" search practicable can be reasonable under the Fourth Amendment. *Skinner*, *supra*, at 629, n. 9 (collecting cases). Respondents' alternative entails substantial difficulties—if it is indeed practicable at all. It may be impracticable, for one thing, simply because the parents who are willing to accept random drug testing for athletes are not willing to accept accusatory drug testing for all students, which transforms the process into a badge of shame. Respondents' proposal brings the risk that teachers will impose testing arbitrarily upon troublesome but not drug-likely students. It generates the expense of defending lawsuits that charge such arbitrary imposition, or that simply demand greater process before accusatory drug

testing is imposed. And not least of all, it adds to the ever-expanding diversionary duties of schoolteachers the new function of spotting and bringing to account drug abuse, a task for which they are ill prepared, and which is not readily compatible with their vocation. Cf. *Skinner, supra*, at 628 (quoting 50 Fed. Reg. 31526 (1985)) (a drug impaired individual "will seldom display any outward 'signs detectable by the lay person or, in many cases, even the physician'"); *Goss*, 419 U. S., at 594 (Powell, J., dissenting) ("There is an ongoing relationship, one in which the teacher must occupy many roles—educator, adviser, friend, and, at times, parent-substitute. It is rarely adversary in nature . . .") (footnote omitted). In many respects, we think, testing based on "suspicion" of drug use would not be better, but worse.[3]

## VI

Taking into account all the factors we have considered above—the decreased expectation of privacy, the relative unobtrusiveness of the search, and the severity of the need met

---

[3] There is no basis for the dissent's insinuation that in upholding the District's Policy we are equating the Fourth Amendment status of school-children and prisoners, who, the dissent asserts, may have what it calls the "categorical protection" of a "strong preference for an individualized suspicion requirement," *post*, at 681. The case on which it relies for that proposition, *Bell* v. *Wolfish*, 441 U. S. 520 (1979), displays no stronger a preference for individualized suspicion than we do today. It reiterates the proposition on which we rely, that "'elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.'" *Id.*, at 559, n. 40 (quoting *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 556–557, n. 12 (1976)). Even *Wolfish's arguendo* "assum[ption] that the existence of less intrusive alternatives is relevant to the determination of the reasonableness of the particular search method at issue," 441 U. S., at 559, n. 40, does not support the dissent, for the opinion ultimately rejected the hypothesized alternative (as we do) on the ground that it would impair other policies important to the institution. See *id.*, at 560, n. 40 (monitoring of visits instead of conducting body searches would destroy "the confidentiality and intimacy that these visits are intended to afford").

by the search—we conclude Vernonia's Policy is reasonable and hence constitutional.

We caution against the assumption that suspicionless drug testing will readily pass constitutional muster in other contexts. The most significant element in this case is the first we discussed: that the Policy was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care.[4] Just as when the government conducts a search in its capacity as employer (a warrantless search of an absent employee's desk to obtain an urgently needed file, for example), the relevant question is whether that intrusion upon privacy is one that a reasonable employer might engage in, see *O'Connor* v. *Ortega*, 480 U. S. 709 (1987); so also when the government acts as guardian and tutor the relevant question is whether the search is one that a reasonable guardian and tutor might undertake. Given the findings of need made by the District Court, we conclude that in the present case it is.

We may note that the primary guardians of Vernonia's schoolchildren appear to agree. The record shows no objection to this districtwide program by any parents other than the couple before us here—even though, as we have described, a public meeting was held to obtain parents' views. We find insufficient basis to contradict the judgment of Vernonia's parents, its school board, and the District Court, as to what was reasonably in the interest of these children under the circumstances.

---

[4] The dissent devotes a few meager paragraphs of its 21 pages to this central aspect of the testing program, see *post*, at 680–682, in the course of which it shows none of the interest in the original meaning of the Fourth Amendment displayed elsewhere in the opinion, see *post*, at 669–671. Of course at the time of the framing, as well as at the time of the adoption of the Fourteenth Amendment, children had substantially fewer "rights" than legislatures and courts confer upon them today. See 1 D. Kramer, Legal Rights of Children § 1.02, p. 9 (2d ed. 1994); Wald, Children's Rights: A Framework for Analysis, 12 U. C. D. L. Rev. 255, 256 (1979).

*  *  *

The Ninth Circuit held that Vernonia's Policy not only violated the Fourth Amendment, but also, by reason of that violation, contravened Article I, § 9, of the Oregon Constitution. Our conclusion that the former holding was in error means that the latter holding rested on a flawed premise. We therefore vacate the judgment, and remand the case to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE GINSBURG, concurring.

The Court constantly observes that the School District's drug-testing policy applies only to students who voluntarily participate in interscholastic athletics. *Ante*, at 650, 657 (reduced privacy expectation and closer school regulation of student athletes), 662 (drug use by athletes risks immediate physical harm to users and those with whom they play). Correspondingly, the most severe sanction allowed under the District's policy is suspension from extracurricular athletic programs. *Ante*, at 651. I comprehend the Court's opinion as reserving the question whether the District, on no more than the showing made here, constitutionally could impose routine drug testing not only on those seeking to engage with others in team sports, but on all students required to attend school. Cf. *United States* v. *Edwards*, 498 F. 2d 496, 500 (CA2 1974) (Friendly, J.) (in contrast to search without notice and opportunity to avoid examination, airport search of passengers and luggage is avoidable "by choosing not to travel by air") (internal quotation marks omitted).

JUSTICE O'CONNOR, with whom JUSTICE STEVENS and JUSTICE SOUTER join, dissenting.

The population of our Nation's public schools, grades 7 through 12, numbers around 18 million. See U. S. Dept. of

Education, National Center for Education Statistics, Digest of Education Statistics 58 (1994) (Table 43). By the reasoning of today's decision, the millions of these students who participate in interscholastic sports, an overwhelming majority of whom have given school officials no reason whatsoever to suspect they use drugs at school, are open to an intrusive bodily search.

In justifying this result, the Court dispenses with a requirement of individualized suspicion on considered policy grounds. First, it explains that precisely because *every* student athlete is being tested, there is no concern that school officials might act arbitrarily in choosing whom to test. Second, a broad-based search regime, the Court reasons, dilutes the accusatory nature of the search. In making these policy arguments, of course, the Court sidesteps powerful, countervailing privacy concerns. Blanket searches, because they can involve "thousands or millions" of searches, "pos[e] a greater threat to liberty" than do suspicion-based ones, which "affec[t] one person at a time," *Illinois* v. *Krull*, 480 U. S. 340, 365 (1987) (O'CONNOR, J., dissenting). Searches based on individualized suspicion also afford potential targets considerable control over whether they will, in fact, be searched because a person can avoid such a search by not acting in an objectively suspicious way. And given that the surest way to avoid acting suspiciously is to avoid the underlying wrongdoing, the costs of such a regime, one would think, are minimal.

But whether a blanket search is "better," *ante*, at 664, than a regime based on individualized suspicion is not a debate in which we should engage. In my view, it is not open to judges or government officials to decide on policy grounds which is better and which is worse. For most of our constitutional history, mass, suspicionless searches have been generally considered *per se* unreasonable within the meaning of the Fourth Amendment. And we have allowed exceptions

in recent years only where it has been clear that a suspicion-based regime would be ineffectual. Because that is not the case here, I dissent.

I

A

In *Carroll* v. *United States*, 267 U. S. 132 (1925), the Court explained that "[t]he Fourth Amendment does not denounce all searches or seizures, but only such as are unreasonable." *Id.*, at 147. Applying this standard, the Court first held that a search of a car was not unreasonable merely because it was warrantless; because obtaining a warrant is impractical for an easily movable object such as a car, the Court explained, a warrant is not required. The Court also held, however, that a warrantless car search *was* unreasonable unless supported by some level of individualized suspicion, namely, probable cause. Significantly, the Court did not base its conclusion on the *express* probable cause requirement contained in the Warrant Clause, which, as just noted, the Court found inapplicable. Rather, the Court rested its views on "what was deemed an unreasonable search and seizure when [the Fourth Amendment] was adopted" and "[what] will conserve public interests as well as the interests and rights of individual citizens." *Id.*, at 149. With respect to the "rights of individual citizens," the Court eventually offered the simple yet powerful intuition that "those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise." *Id.*, at 154.

More important for the purposes of this case, the Court clearly indicated that evenhanded treatment was no substitute for the individualized suspicion requirement:

"It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on

the chance of finding liquor and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search." *Id.*, at 153–154.

The *Carroll* Court's view that blanket searches are "intolerable and unreasonable" is well grounded in history. As recently confirmed in one of the most exhaustive analyses of the original meaning of the Fourth Amendment ever undertaken, see W. Cuddihy, The Fourth Amendment: Origins and Original Meaning (1990) (Ph.D. Dissertation at Claremont Graduate School) (hereinafter Cuddihy), what the Framers of the Fourth Amendment most strongly opposed, with limited exceptions wholly inapplicable here, were general searches—that is, searches by general warrant, by writ of assistance, by broad statute, or by any other similar authority. See *id.*, at 1402, 1499, 1555; see also Clancy, The Role of Individualized Suspicion in Assessing the Reasonableness of Searches and Seizures, 25 Mem. St. U. L. Rev. 483, 528 (1994); Maclin, When the Cure for the Fourth Amendment Is Worse Than the Disease, 68 S. Cal. L. Rev. 1, 9–12 (1994); L. Levy, Original Intent and the Framers' Constitution 221–246 (1988). Although, ironically, such warrants, writs, and statutes typically required individualized suspicion, see, *e. g.*, Cuddihy 1140 ("Typical of the American warrants of 1761–76 was Starke's 'tobacco' warrant, which commanded its bearer to 'enter any *suspected* Houses'") (emphasis added), such requirements were subjective and largely unenforceable. Accordingly, these various forms of authority led in practice to "virtually unrestrained," and hence "general," searches. J. Landynski, Search and Seizure and the Supreme Court 20 (1966). To be sure, the Fourth Amendment, in the Warrant Clause, prohibits by name only searches by general warrants. But that was only because the abuses of the general warrant were particularly vivid in the minds of the Framers' generation, Cuddihy 1554–1560, and not because the Framers viewed other kinds of general searches as any less unreasonable. "Prohibition of the general warrant was part of a

larger scheme to extinguish general searches categorically."
*Id.*, at 1499.

More important, there is no indication in the historical materials that the Framers' opposition to general searches stemmed solely from the fact that they allowed officials to single out individuals for arbitrary reasons, and thus that officials could render them reasonable simply by making sure to extend their search to *every* house in a given area or to *every* person in a given group. See *Delaware* v. *Prouse*, 440 U. S. 648, 664 (1979) (REHNQUIST, J., dissenting) (referring to this as the "'misery loves company'" theory of the Fourth Amendment). On the contrary, although general searches were typically arbitrary, they were not invariably so. Some general searches, for example, were of the arguably evenhanded "door-to-door" kind. Cuddihy 1091; see also *id.*, at 377, 1502, 1557. Indeed, Cuddihy's descriptions of a few blanket searches suggest they may have been considered *more* worrisome than the typical general search. See *id.*, at 575 ("One type of warrant [between 1700 and 1760] went beyond a general search, in which the searcher entered and inspected suspicious places, by requiring him to search entire categories of places whether he suspected them or not"); *id.*, at 478 ("During the exigencies of Queen Anne's War, two colonies even authorized searches in 1706 that extended to entire geographic areas, not just to suspicious houses in a district, as conventional general warrants allowed").

Perhaps most telling of all, as reflected in the text of the Warrant Clause, the particular way the Framers chose to curb the abuses of general warrants—and by implication, *all* general searches—was not to impose a novel "evenhandedness" requirement; it was to retain the individualized suspicion requirement contained in the typical general warrant, but to make that requirement meaningful and enforceable, for instance, by raising the required level of individualized suspicion to objective probable cause. See U. S. Const., Amdt. 4. So, for example, when the same Congress that

proposed the Fourth Amendment authorized duty collectors to search for concealed goods subject to import duties, specific warrants were required for searches on land; but even for searches at sea, where warrants were impractical and thus not required, Congress nonetheless limited officials to searching only those ships and vessels "in which [a collector] *shall have reason to suspect* any goods, wares or merchandise subject to duty shall be concealed." The Collection Act of July 31, 1789, §24, 1 Stat. 43 (emphasis added); see also Cuddihy 1490–1491 ("The Collection Act of 1789 was [the] most significant [of all early search statutes], for it identified the techniques of search and seizure that the framers of the amendment believed reasonable while they were framing it"). Not surprisingly, the *Carroll* Court relied on this statute and other subsequent ones like it in arriving at its views. See *Carroll*, 267 U. S., at 150–151, 154; cf. Clancy, *supra*, at 489 ("While the plain language of the Amendment does not mandate individualized suspicion as a necessary component of all searches and seizures, the historical record demonstrates that the framers believed that individualized suspicion was an inherent quality of reasonable searches and seizures").

True, not all searches around the time the Fourth Amendment was adopted required individualized suspicion—although most did. A search incident to arrest was an obvious example of one that did not, see Cuddihy 1518, but even those searches shared the essential characteristics that distinguish suspicion-based searches from abusive general searches: they only "affec[t] one person at a time," *Krull*, 480 U. S., at 365 (O'CONNOR, J., dissenting), and they are generally avoidable by refraining from wrongdoing. See *supra*, at 667. Protection of privacy, not evenhandedness, was then and is now the touchstone of the Fourth Amendment.

The view that mass, suspicionless searches, however evenhanded, are generally unreasonable remains inviolate in the criminal law enforcement context, see *Ybarra* v. *Illinois*, 444

U. S. 85 (1979) (invalidating evenhanded, nonaccusatory pat-down for weapons of all patrons in a tavern in which there was probable cause to think drug dealing was going on), at least where the search is more than minimally intrusive, see *Michigan Dept. of State Police* v. *Sitz*, 496 U. S. 444 (1990) (upholding the brief and easily avoidable detention, for pur-poses of observing signs of intoxication, of all motorists ap-proaching a roadblock). It is worth noting in this regard that state-compelled, state-monitored collection and testing of urine, while perhaps not the most intrusive of searches, see, *e. g., Bell* v. *Wolfish*, 441 U. S. 520, 558–560 (1979) (visual body cavity searches), is still "particularly destructive of pri-vacy and offensive to personal dignity." *Treasury Employ-ees* v. *Von Raab*, 489 U. S. 656, 680 (1989) (SCALIA, J., dissent-ing); see also *ante*, at 658; *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 617 (1989). We have not hesitated to treat monitored bowel movements as highly in-trusive (even in the special border search context), compare *United States* v. *Martinez-Fuerte*, 428 U. S. 543 (1976) (brief interrogative stops of all motorists crossing certain border checkpoint reasonable without individualized suspicion), with *United States* v. *Montoya de Hernandez*, 473 U. S. 531 (1985) (monitored bowel movement of border crossers rea-sonable only upon reasonable suspicion of alimentary canal smuggling), and it is not easy to draw a distinction. See Fried, Privacy, 77 Yale L. J. 475, 487 (1968) ("[I]n our culture the excretory functions are shielded by more or less absolute privacy"). And certainly monitored urination combined with urine testing is more intrusive than some personal searches we have said trigger Fourth Amendment protec-tions in the past. See, *e. g., Cupp* v. *Murphy*, 412 U. S. 291, 295 (1973) (Stewart, J.) (characterizing the scraping of dirt from under a person's fingernails as a " 'severe, though brief, intrusion upon cherished personal security' ") (citation omit-ted). Finally, the collection and testing of urine is, of course, a search of a person, one of only four categories of suspect

searches the Constitution mentions by name. See U. S. Const., Amdt. 4 (listing "persons, houses, papers, and effects"); cf. Cuddihy 835, 1518, 1552, n. 394 (indicating long history of outrage at personal searches before 1789).

Thus, it remains the law that the police cannot, say, subject to drug testing every person entering or leaving a certain drug-ridden neighborhood in order to find evidence of crime. 3 W. LaFave, Search and Seizure § 9.5(b), pp. 551–553 (2d ed. 1987) (hereinafter LaFave). And this is true even though it is hard to think of a more compelling government interest than the need to fight the scourge of drugs on our streets and in our neighborhoods. Nor could it be otherwise, for if being evenhanded were enough to justify evaluating a search regime under an open-ended balancing test, the Warrant Clause, which presupposes that there is *some* category of searches for which individualized suspicion is nonnegotiable, see 2 LaFave § 4.1, at 118, would be a dead letter.

Outside the criminal context, however, in response to the exigencies of modern life, our cases have upheld several evenhanded blanket searches, including some that are more than minimally intrusive, after balancing the invasion of privacy against the government's strong need. Most of these cases, of course, are distinguishable insofar as they involved searches either not of a personally intrusive nature, such as searches of closely regulated businesses, see, *e. g., New York* v. *Burger*, 482 U. S. 691, 699–703 (1987); cf. Cuddihy 1501 ("Even the states with the strongest constitutional restrictions on general searches had long exposed commercial establishments to warrantless inspection"), or arising in unique contexts such as prisons, see, *e. g., Wolfish, supra*, at 558–560 (visual body cavity searches of prisoners following contact visits); cf. Cuddihy 1516–1519, 1552–1553 (indicating that searches incident to arrest and prisoner searches were the only common personal searches at time of founding). This certainly explains why JUSTICE SCALIA, in his dissent in our recent *Von Raab* decision, found it significant that "[u]ntil

today this Court had upheld a bodily search separate from arrest and without individualized suspicion of wrongdoing only with respect to prison inmates, relying upon the uniquely dangerous nature of that environment." *Von Raab, supra,* at 680 (citation omitted).

In any event, in many of the cases that can be distinguished on the grounds suggested above and, more important, in *all* of the cases that cannot, see, *e. g., Skinner, supra* (blanket drug testing scheme); *Von Raab, supra* (same); cf. *Camara* v. *Municipal Court of City and County of San Francisco,* 387 U. S. 523 (1967) (area-wide searches of private residences), we upheld the suspicionless search only after first recognizing the Fourth Amendment's longstanding preference for a suspicion-based search regime, and then pointing to sound reasons why such a regime would likely be ineffectual under the unusual circumstances presented. In *Skinner,* for example, we stated outright that " 'some quantum of individualized suspicion' " is "usually required" under the Fourth Amendment, *Skinner, supra,* at 624, quoting *Martinez-Fuerte, supra,* at 560, and we built the requirement into the test we announced: "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion *would be placed in jeopardy by a requirement of individualized suspicion,* a search may be reasonable despite the absence of such suspicion," 489 U. S., at 624 (emphasis added). The obvious negative implication of this reasoning is that, if such an individualized suspicion requirement would *not* place the government's objectives in jeopardy, the requirement should not be forsaken. See also *Von Raab, supra,* at 665–666.

Accordingly, we upheld the suspicionless regime at issue in *Skinner* on the firm understanding that a requirement of individualized suspicion for testing train operators for drug or alcohol impairment following serious train accidents would be unworkable because "the scene of a serious rail

accident is chaotic." *Skinner*, 489 U. S., at 631. (Of course, it could be plausibly argued that the fact that testing occurred only *after* train operators were involved in serious train accidents amounted to an individualized suspicion requirement in all but name, in light of the record evidence of a strong link between serious train accidents and drug and alcohol use.) We have performed a similar inquiry in the other cases as well. See *Von Raab*, 489 U. S., at 674 (suspicion requirement for searches of customs officials for drug impairment impractical because "not feasible to subject [such] employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments"); *Camara, supra*, at 537 (suspicion requirement for searches of homes for safety code violations impractical because conditions such as "faulty wiring" not observable from outside of house); see also *Wolfish*, 441 U. S., at 559–560, n. 40 (suspicion requirement for searches of prisoners for smuggling following contact visits impractical because observation necessary to gain suspicion would cause "obvious disruption of the confidentiality and intimacy that these visits are intended to afford"); *Martinez-Fuerte*, 428 U. S., at 557 ("A requirement that stops on major routes inland always be based on reasonable suspicion would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens"); *United States* v. *Edwards*, 498 F. 2d 496, 500 (CA2 1974) (Friendly, J.) (suspicion-based searches of airport passengers' carry-on luggage impractical because of the great number of plane travelers and "conceded inapplicability" of the profile method of detecting hijackers).

Moreover, an individualized suspicion requirement was often impractical in these cases because they involved situations in which even one undetected instance of wrongdoing could have injurious consequences for a great number of people. See, *e. g., Camara, supra*, at 535 (even one safety code

violation can cause "fires and epidemics [that] ravage large urban areas"); *Skinner, supra,* at 628 (even one drug- or alcohol-impaired train operator can lead to the "disastrous consequences" of a train wreck, such as "great human loss"); *Von Raab, supra,* at 670, 674, 677 (even one customs official caught up in drugs can, by virtue of impairment, susceptibility to bribes, or indifference, result in the noninterdiction of a "sizable drug shipmen[t]," which eventually injures the lives of thousands, or to a breach of "national security"); *Edwards, supra,* at 500 (even one hijacked airplane can destroy "'hundreds of human lives and millions of dollars of property'") (citation omitted).

### B

The instant case stands in marked contrast. One searches today's majority opinion in vain for recognition that history and precedent establish that individualized suspicion is "usually required" under the Fourth Amendment (regardless of whether a warrant and probable cause are also required) and that, in the area of intrusive personal searches, the only recognized exception is for situations in which a suspicion-based scheme would be likely ineffectual. See *supra,* at 674–675 and this page. Far from acknowledging anything special about individualized suspicion, the Court treats a suspicion-based regime as if it were just any run-of-the-mill, less intrusive alternative—that is, an alternative that officials may bypass if the lesser intrusion, in their reasonable estimation, is outweighed by policy concerns unrelated to practicability.

As an initial matter, I have serious doubts whether the Court is right that the District reasonably found that the lesser intrusion of a suspicion-based testing program outweighed its genuine concerns for the adversarial nature of such a program, and for its abuses. See *ante,* at 663–664. For one thing, there are significant safeguards against abuses. The fear that a suspicion-based regime will lead to the testing of "troublesome but not drug-likely" students,

*ante,* at 663, for example, ignores that the required level of suspicion in the school context is objectively *reasonable* suspicion. In this respect, the facts of our decision in *New Jersey* v. *T. L. O.,* 469 U. S. 325 (1985), should be reassuring. There, we found reasonable suspicion to search a ninth-grade girl's purse for cigarettes after a teacher caught the girl smoking in the bathroom with a companion who admitted it. See *id.,* at 328, 345–346. Moreover, any distress arising from what turns out to be a false accusation can be minimized by keeping the entire process confidential.

For another thing, the District's concern for the adversarial nature of a suspicion-based regime (which appears to extend even to those who are *rightly* accused) seems to ignore the fact that such a regime would not exist in a vacuum. Schools already have adversarial, disciplinary schemes that require teachers and administrators in many areas besides drug use to investigate student wrongdoing (often by means of accusatory searches); to make determinations about whether the wrongdoing occurred; and to impose punishment. To such a scheme, suspicion-based drug testing would be only a minor addition. The District's own elaborate disciplinary scheme is reflected in its handbook, which, among other things, lists the following disciplinary "problem areas" carrying serious sanctions: "DEFIANCE OF AUTHORITY," "DISORDERLY OR DISRUPTIVE CONDUCT INCLUDING FOUL LANGUAGE," "AUTOMOBILE USE OR MISUSE," "FORGERY OR LYING," "GAMBLING," "THEFT," "TOBACCO," "MISCHIEF," "VANDALISM," "RECKLESSLY ENDANGERING," "MENACING OR HARASSMENT," "ASSAULT," "FIGHTING," "WEAPONS," "EXTORTION," "EXPLOSIVE DEVICES," and "ARSON." Record, Exh. 2, p. 11; see also *id.,* at 20–21 (listing rules regulating dress and grooming, public displays of affection, and the wearing of hats inside); cf. *id.,* at 8 ("RESPONSIBILITIES OF SCHOOLS" include "To develop and distribute to parents and students reasonable rules

and regulations governing student behavior and attendance" and "To provide fair and reasonable standards of conduct and to enforce those standards through appropriate disciplinary action"). The high number of disciplinary referrals in the record in this case illustrates the District's robust scheme in action.

In addition to overstating its concerns with a suspicion-based program, the District seems to have *understated* the extent to which such a program is less intrusive of students' privacy. By invading the privacy of a few students rather than many (nationwide, of thousands rather than millions), and by giving potential search targets substantial control over whether they will, in fact, be searched, a suspicion-based scheme is *significantly* less intrusive.

In any event, whether the Court is right that the District reasonably weighed the lesser intrusion of a suspicion-based scheme against its policy concerns is beside the point. As stated, a suspicion-based search regime is not just any less intrusive alternative; the individualized suspicion requirement has a legal pedigree as old as the Fourth Amendment itself, and it may not be easily cast aside in the name of policy concerns. It may only be forsaken, our cases in the personal search context have established, if a suspicion-based regime would likely be ineffectual.

But having misconstrued the fundamental role of the individualized suspicion requirement in Fourth Amendment analysis, the Court never seriously engages the practicality of such a requirement in the instant case. And that failure is crucial because nowhere is it *less* clear that an individualized suspicion requirement would be ineffectual than in the school context. In most schools, the entire pool of potential search targets—students—is under constant supervision by teachers and administrators and coaches, be it in classrooms, hallways, or locker rooms. See *T. L. O.*, 469 U. S., at 339 ("[A] proper educational environment requires close supervision of schoolchildren").

The record here indicates that the Vernonia schools are no exception. The great irony of this case is that most (though not all) of the evidence the District introduced to justify its suspicionless drug testing program consisted of first- or second-hand stories of particular, identifiable students acting in ways that plainly gave rise to reasonable suspicion of in-school drug use—and thus that would have justified a drug-related search under our *T. L. O.* decision. See *id.*, at 340–342 (warrant and probable cause not required for school searches; reasonable suspicion sufficient). Small groups of students, for example, were observed by a teacher "passing joints back and forth" across the street at a restaurant before school and during school hours. Tr. 67 (Apr. 29, 1992). Another group was caught skipping school and using drugs at one of the students' houses. See *id.*, at 93–94. Several students actually *admitted* their drug use to school officials (some of them being caught with marijuana pipes). See *id.*, at 24. One student presented himself to his teacher as "clearly obviously inebriated" and had to be sent home. *Id.*, at 68. Still another was observed dancing and singing at the top of his voice in the back of the classroom; when the teacher asked what was going on, he replied, "Well, I'm just high on life." *Id.*, at 89–90. To take a final example, on a certain road trip, the school wrestling coach smelled marijuana smoke in a motel room occupied by four wrestlers, see *id.*, at 110–112, an observation that (after some questioning) would probably have given him reasonable suspicion to test one or all of them. Cf. 4 LaFave § 10.11(b), at 169 ("[I]n most instances the evidence of wrongdoing prompting teachers or principals to conduct searches is sufficiently detailed and specific to meet the traditional probable cause test").

In light of all this evidence of drug use by particular students, there is a substantial basis for concluding that a vigorous regime of suspicion-based testing (for which the District appears already to have rules in place, see Record, Exh. 2, at 14, 17) would have gone a long way toward solving Ver-

nonia's school drug problem while preserving the Fourth Amendment rights of James Acton and others like him. And were there any doubt about such a conclusion, it is removed by indications in the record that suspicion-based testing could have been supplemented by an equally vigorous campaign to have Vernonia's parents encourage their children to submit to the District's *voluntary* drug testing program. See *id.*, at 32 (describing the voluntary program); *ante*, at 665 (noting widespread parental support for drug testing). In these circumstances, the Fourth Amendment dictates that a mass, suspicionless search regime is categorically unreasonable.

I recognize that a suspicion-based scheme, even where reasonably effective in controlling in-school drug use, may not be *as* effective as a mass, suspicionless testing regime. In one sense, that is obviously true—just as it is obviously true that suspicion-based law enforcement is not as effective as mass, suspicionless enforcement might be. "But there is nothing new in the realization" that Fourth Amendment protections come with a price. *Arizona* v. *Hicks*, 480 U. S. 321, 329 (1987). Indeed, the price we pay is higher in the criminal context, given that police do not closely observe the entire class of potential search targets (all citizens in the area) and must ordinarily adhere to the rigid requirements of a warrant and probable cause.

The principal counterargument to all this, central to the Court's opinion, is that the Fourth Amendment is more lenient with respect to school searches. That is no doubt correct, for, as the Court explains, *ante*, at 655–656, schools have traditionally had special guardianlike responsibilities for children that necessitate a degree of constitutional leeway. This principle explains the considerable Fourth Amendment leeway we gave school officials in *T. L. O.* In that case, we held that children at school do not enjoy two of the Fourth Amendment's traditional categorical protections against unreasonable searches and seizures: the warrant requirement

and the probable cause requirement. See *T. L. O.*, 469 U. S., at 337–343. And this was true even though the same children enjoy such protections "in a nonschool setting." *Id.*, at 348 (Powell, J., concurring).

The instant case, however, asks whether the Fourth Amendment is even more lenient than that, *i. e.*, whether it is *so* lenient that students may be deprived of the Fourth Amendment's only remaining, and most basic, categorical protection: its strong preference for an individualized suspicion requirement, with its accompanying antipathy toward personally intrusive, blanket searches of mostly innocent people. It is not at all clear that people in *prison* lack this categorical protection, see *Wolfish*, 441 U. S., at 558–560 (upholding certain suspicionless searches of prison inmates); but cf. *supra*, at 675 (indicating why suspicion requirement was impractical in *Wolfish*), and we have said "[w]e are not yet ready to hold that the schools and the prisons need be equated for purposes of the Fourth Amendment." *T. L. O.*, *supra*, at 338–339. Thus, if we are to mean what we often proclaim—that students do not "shed their constitutional rights . . . at the schoolhouse gate," *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 506 (1969)—the answer must plainly be no.[1]

---

[1] The Court says I pay short shrift to the original meaning of the Fourth Amendment as it relates to searches of public school children. See *ante*, at 665, n. 4. As an initial matter, the historical materials on what the Framers thought of official searches of children, let alone of public school children (the concept of which did not exist at the time, see *ante*, at 652, n. 1), are extremely scarce. Perhaps because of this, the Court does not itself offer an account of the original meaning, but rather resorts to the general proposition that children had fewer recognized rights at the time of the framing than they do today. But that proposition seems uniquely unhelpful in the present case, for although children may have had fewer rights against the private schoolmaster at the time of the framing than they have against public school officials today, *parents* plainly had *greater* rights then than now. At the time of the framing, for example, the fact that a child's parents refused to authorize a private schoolmaster's search of the child would probably have rendered any such search unlawful; after

For the contrary position, the Court relies on cases such as *T. L. O., Ingraham* v. *Wright*, 430 U. S. 651 (1977), and *Goss* v. *Lopez*, 419 U. S. 565 (1975). See *ante,* at 655–656. But I find the Court's reliance on these cases ironic. If anything, they affirm that schools have substantial constitutional leeway in carrying out their traditional mission of responding to *particularized* wrongdoing. See *T. L. O., supra* (leeway in investigating particularized wrongdoing); *Ingraham, supra* (leeway in punishing particularized wrongdoing); *Goss, supra* (leeway in choosing procedures by which particularized wrongdoing is punished).

By contrast, intrusive, blanket searches of schoolchildren, most of whom are innocent, for evidence of serious wrongdoing are not part of any traditional school function of which I am aware. Indeed, many schools, like many parents, prefer to trust their children unless given reason to do otherwise. As James Acton's father said on the witness stand, "[suspicionless testing] sends a message to children that are trying to be responsible citizens . . . that they have to prove that they're innocent . . . , and I think that kind of sets a bad tone for citizenship." Tr. 9 (Apr. 29, 1992).

I find unpersuasive the Court's reliance, *ante,* at 656–657, on the widespread practice of physical examinations and vaccinations, which are both blanket searches of a sort. Of course, for these practices to have *any* Fourth Amendment significance, the Court has to assume that these physical exams and vaccinations are typically "required" to a similar extent that urine testing and collection is required in the instant case, *i. e.,* that they are required regardless of parental

all, at common law, the source of the schoolmaster's authority over a child was a delegation of the parent's authority. See *ante,* at 654–655. Today, of course, the fact that a child's parents refuse to authorize a public school search of the child—as James Acton's parents refused here—is of little constitutional moment. Cf. *Ingraham* v. *Wright,* 430 U. S. 651, 662, n. 22 (1977) ("[P]arental approval of corporal punishment is not constitutionally required").

objection and that some meaningful sanction attaches to the failure to submit. In any event, without forming any particular view of such searches, it is worth noting that a suspicion requirement for vaccinations is not merely impractical; it is nonsensical, for vaccinations are not searches *for anything in particular* and so there is nothing about which to be suspicious. Nor is this saying anything new; it is the same theory on which, in part, we have repeatedly upheld certain inventory searches. See, *e. g., South Dakota* v. *Opperman,* 428 U. S. 364, 370, n. 5 (1976) ("The probable-cause approach is unhelpful when analysis centers upon the reasonableness of routine administrative caretaking functions"). As for physical examinations, the practicability of a suspicion requirement is highly doubtful because the conditions for which these physical exams ordinarily search, such as latent heart conditions, do not manifest themselves in observable behavior the way school drug use does. See *supra,* at 679–680.

It might also be noted that physical exams (and of course vaccinations) are not searches for conditions that reflect wrongdoing on the part of the student, and so are *wholly* nonaccusatory and have no consequences that can be regarded as punitive. These facts may explain the absence of Fourth Amendment challenges to such searches. By contrast, although I agree with the Court that the accusatory nature of the District's testing program is *diluted* by making it a blanket one, any testing program that searches for conditions plainly reflecting serious wrongdoing can never be made wholly nonaccusatory from the student's perspective, the motives for the program notwithstanding; and for the same reason, the substantial consequences that can flow from a positive test, such as suspension from sports, are invariably—and quite reasonably—understood as punishment. The best proof that the District's testing program is to *some* extent accusatory can be found in James Acton's own explanation on the witness stand as to why he did not want to submit to drug testing: "Because I feel that they have no

reason to think I was taking drugs." Tr. 13 (Apr. 29, 1992). It is hard to think of a manner of explanation that resonates more intensely in our Fourth Amendment tradition than this.

## II

I do not believe that suspicionless drug testing is justified on these facts. But even if I agreed that some such testing were reasonable here, I see two other Fourth Amendment flaws in the District's program.[2] First, and most serious, there is virtually no evidence in the record of a drug problem at the Washington Grade School, which includes the seventh and eighth grades, and which Acton attended when this litigation began. This is not surprising, given that, of the four witnesses who testified to drug-related incidents, three were teachers and/or coaches at the high school, see Tr. 65; *id.*, at 86; *id.*, at 99, and the fourth, though the principal of the grade school at the time of the litigation, had been employed as principal of the high school during the years leading up to (and beyond) the implementation of the drug testing policy. See *id.*, at 17. The only evidence of a grade school drug problem that my review of the record uncovered is a "guarantee" by the late-arriving grade school principal that "our problems we've had in '88 and '89 didn't start at the high school level. They started in the elementary school." *Id.*, at 43. But I would hope that a single assertion of this sort would not serve as an adequate basis on which to uphold mass, suspicionless drug testing of two entire grades of student athletes—in Vernonia and, by the Court's reasoning, in other school districts as well. Perhaps there is a drug problem at the grade school, but one would not know it from this

---

[2] Because I agree with the Court that we may assume the District's program allows students to confine the advanced disclosure of highly personal prescription medications to the testing lab, see *ante*, at 660, I also agree that *Skinner* controls this aspect of the case, and so do not count the disclosure requirement among the program's flaws.

record. At the least, then, I would insist that the parties and the District Court address this issue on remand.

Second, even as to the high school, I find unreasonable the school's choice of student athletes as the class to subject to suspicionless testing—a choice that appears to have been driven more by a belief in what would pass constitutional muster, see *id.*, at 45–47 (indicating that the original program was targeted at students involved in any extracurricular activity), than by a belief in what was required to meet the District's principal disciplinary concern. Reading the full record in this case, as well as the District Court's authoritative summary of it, 796 F. Supp. 1354, 1356–1357 (Ore. 1992), it seems quite obvious that the true driving force behind the District's adoption of its drug testing program was the need to combat the rise in drug-related disorder and disruption in its classrooms and around campus. I mean no criticism of the strength of that interest. On the contrary, where the record demonstrates the existence of such a problem, that interest seems self-evidently compelling. "Without first establishing discipline and maintaining order, teachers cannot begin to educate their students." *T. L. O.*, 469 U. S., at 350 (Powell, J., concurring). And the record in this case surely demonstrates there was a drug-related discipline problem in Vernonia of " 'epidemic proportions.' " 796 F. Supp., at 1357. The evidence of a drug-related sports injury problem at Vernonia, by contrast, was considerably weaker.

On this record, then, it seems to me that the far more reasonable choice would have been to focus on the class of students found to have violated published school rules against severe disruption in class and around campus, see Record, Exh. 2, at 9, 11—disruption that had a strong nexus to drug use, as the District established at trial. Such a choice would share two of the virtues of a suspicion-based regime: testing dramatically fewer students, tens as against hundreds, and giving students control, through their behav-

ior, over the likelihood that they would be tested. Moreover, there would be a reduced concern for the accusatory nature of the search, because the Court's feared "badge of shame," *ante*, at 663, would already exist, due to the antecedent accusation and finding of severe disruption. In a lesser known aspect of *Skinner*, we upheld an analogous testing scheme with little hesitation. See *Skinner*, 489 U. S., at 611 (describing "'Authorization to Test for Cause'" scheme, according to which train operators would be tested "in the event of certain specific rule violations, including noncompliance with a signal and excessive speeding").

### III

It cannot be too often stated that the greatest threats to our constitutional freedoms come in times of crisis. But we must also stay mindful that not all government responses to such times are hysterical overreactions; some crises are quite real, and when they are, they serve precisely as the compelling state interest that we have said may justify a measured intrusion on constitutional rights. The only way for judges to mediate these conflicting impulses is to do what they should do anyway: stay close to the record in each case that appears before them, and make their judgments based on that alone. Having reviewed the record here, I cannot avoid the conclusion that the District's suspicionless policy of testing all student athletes sweeps too broadly, and too imprecisely, to be reasonable under the Fourth Amendment.