**UNITED STATES of America, Plaintiff,**

**v.**

**Ervin PHILLIPS, Jr., a/k/a/ "Irving Phillips," Defendant.**

**Criminal Action No. 97–CR–24–B.**

United States District Court,
D. Colorado.

Sept. 25, 1997.

Henry L. Solano, U.S. Atty., Kathleen Tafoya, Asst. U.S. Atty., Denver, CO, for Plaintiff.

Michael Katz, Fed. Public Def., Nancy Holton, Asst. Fed. Public Def., Denver, CO, for Defendant.

## MEMORANDUM OPINION & ORDER

BABCOCK, District Judge.

Defendant, Ervin Phillips, Jr., moves to suppress all evidence obtained as a result of his arrest and a search of his home on October 31, 1996. I heard oral argument on this motion on September 19, 1997. For the following reasons, I will deny defendant's motion.

### I.

For the purposes of this order, I find the following facts. On October 28, 1996, officers from the Denver Police Department received a complaint from Ethyl White, a former girlfriend of Ervin Phillips, Jr., alleging that defendant had kidnaped and assaulted her. White told police that she had been sleeping with her boyfriend, Reggie Johnson, when defendant forced his way into the house through the back door with his nephew, Darcy Arthur, his son J. J., and a friend she knew only as "Shoog." She stated that defendant had a Derringer and Shoog had a 9 mm handgun. Defendant allegedly pointed the gun at her and ordered her to get dressed or else he would shoot her in the knee. She also stated that defendant struck her in the face, then wrapped a belt around his hand and hit her in the face again.

White further told police that after getting dressed, defendant and the others made her get into the back of a car and drove to Colorado Springs. They went to the house of defendant's son's girlfriend, Alicia. At one point, White stated that she had left the house with Alicia to get some food at Wendy's. She later stated that she did not attempt to escape at that time because she did not know her way around Colorado Springs.

White told police that when they returned to Alicia's house, defendant attempted to hit her again, and she locked herself in a bathroom. She then ran out the door and went to a neighbor's house. The neighbor fed her and helped her get on a bus to Denver, where she contacted police.

While investigating White's complaint, police interviewed Ms. Beulah Neal, who was at Reggie Johnson's house the night of the alleged kidnaping. Neal stated, "No way she got kidnaped! She's into too much stuff for her own good!" In a written statement to police, however, she stated that she had left the house before the alleged kidnaping. Reggie Johnson was also interviewed but refused to give a statement other than that he was there when her boyfriend came and got her.

When White complained to police about defendant, police discovered two active cases against White for possession of a controlled substance with active warrants for her arrest. White was, therefore, arrested. While in jail, on October 31, 1996, White phoned supervisory parole officer Leslie Waggener. Waggener knew White because White had previously been on parole. White told Waggener of her alleged kidnaping. She also told Waggener that defendant, who was then on parole, had guns and drugs in his house and usually in his jacket as well.

Waggener phoned the Denver Police Department and discovered that Det. David Schultz was handling the kidnaping investi-

gation. She left a message for Schultz to call her. By that time, Waggener had already decided to search defendant's house for parole violations. Schultz obtained a warrant for defendant's arrest on kidnaping charges. He then phoned Waggener, who was assembling with other parole officers one-half block from defendant's house. Waggener asked Schultz to meet them at that location. When Schultz arrived, he informed Waggener and parole officer Ralph Nolan that he had obtained a warrant for defendant's arrest.

Parole officer Waggener, along with other parole officers and Detective Schultz went to defendant's residence to arrest him and investigate alleged parole violations. It was agreed that Schultz would arrest defendant but would not participate in the search of his residence as he did not have a search warrant. The front door was open but the screened door was closed, and Waggener observed defendant inside. She knocked on the door and ordered defendant to come outside. Instead, defendant stepped back away from the door. Two parole officers then went into the house and forcibly brought defendant out. Defendant was wearing a black jacket, but he managed to remove it before he came outside. Schultz arrested defendant and his person was searched. Waggener discovered a large amount of cash in defendant's pants pocket.

Parole officers then searched the jacket, which was still inside the house. Inside the jacket, the officers found a small amount of crack cocaine and a Derringer handgun. Meanwhile, other parole officers were searching further into the house. They found another handgun beneath a mattress in the basement. Waggener and Nolan also searched the back, upstairs bedroom of the house. White had told Waggener that defendant kept a "black gun" in a drawer or black vinyl bag in that bedroom. Waggener found a 9 mm handgun in a black vinyl bag. In addition, Nolan found what appeared to be a larger amount of crack cocaine in a bureau drawer. In that same bedroom, officers found a U.S. West phone bill and a prescription bottle of medication bearing the name of defendant.

Police officer Schultz, who had not yet entered the house, was then called in to verify whether the substance found by Nolan was crack cocaine. Schultz, who is not a narcotics officer, believed the substance to be cocaine, but called for a member of the narcotics division to be certain. A narcotics officer arrived shortly thereafter and verified Schultz's assessment. The officers then discontinued the search and obtained a search warrant for the entire house.

Defendant was never charged with kidnaping. He has been indicted here on five counts: (1) Possession with intent to distribute (2.5563 grams of a mixture containing cocaine base); (2) Possession with intent to distribute (97.2188 grams); (3) Using and carrying a firearm in connection with possession with intent to distribute; (4) Possession of guns after felony conviction. In count five, the government seeks forfeiture of all property constituting or derived from proceeds of the other four crimes.

Defendant moves to suppress all evidence seized from his home.

## II.

■ The Fourth Amendment protects individuals from unreasonable searches and seizures. Generally, the government is obligated to conduct searches pursuant to a warrant supported by probable cause. *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 650–655, 115 S.Ct. 2386, 2390–91, 132 L.Ed.2d 564 (1995). The Supreme Court, however, has recognized an exception to the warrant requirement to accommodate the "special needs" of a state's probation system. *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987). The Court reasoned that the warrant requirement must yield where " 'special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirement impracticable.' " *Id.* (*quoting New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S.Ct. 733, 747, 83 L.Ed.2d 720 (1985) (Blackmun, J., concurring)).

■ Similarly, "[p]arolees do not enjoy 'the absolute liberty to which every citizen is entitled, but only ... conditional liberty

properly dependent on observance of special parole restrictions.'" *United States v. Lewis*, 71 F.3d 358, 361 (10th Cir.1995) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484 (1972)). Therefore, the Tenth Circuit has concluded that the same "special needs" of a state's probation system cited in *Griffin* apply to a state's parole system. *Id.* The "twin aims" of rehabilitating parolees and protecting the public "justify the state limiting a parolee's Fourth Amendment rights and consequent expectations of privacy." *Lewis, supra* at 361.

To determine the lawfulness of a warrantless search of a parolee's home, I must balance the parolee's expectation of privacy against the state's interests "to determine the level of individualized suspicion necessary to support a warrantless search." *Id.* Here, I must determine whether the parole agents carried out the search "pursuant to a state law which itself satisfies the Fourth Amendment's reasonableness requirement." *Id.* Therefore, I must address two issues: (1) whether the state law of Colorado requires sufficient prerequisites to a warrantless search of a parolee's home to satisfy the Fourth Amendment; and (2) whether the officers complied with those prerequisites in executing the search. *Id.* at 362.

Colorado requires that, to conduct a warrantless search, a parole officer have "reasonable grounds to believe that a parole violation has occurred. Under these circumstances, when he conducts his search in connection with that investigation, the need for a search warrant is eliminated." *People v. Anderson*, 189 Colo. 34, 536 P.2d 302, 305 (1975). I conclude that the second sentence of this quotation implies that the parole officer must have "reasonable grounds" to believe that his search will yield evidence of a parole violation. This standard is identical to the "reasonable grounds" standard adopted by Wisconsin in the probation context, which was approved by the Supreme Court in *Griffin. Griffin, supra* at 872, 107 S.Ct. at 3167. Accordingly, I conclude that Colorado's prerequisites for a warrantless search of a parolee's home satisfy the Fourth Amendment.

I turn next to whether the parole officers involved here had reasonable grounds to search defendant's house. I find and conclude that they did. As conditions of his parole, defendant agreed that: (1) parole officers could search his person or residence; and (2) he could not possess firearms or contraband. Gov't Exh. 1. Ms. White's allegations to Waggener provided reasonable grounds to believe that defendant was in possession of handguns and illegal drugs. Waggener knew White. She also knew that White had knowingly subjected herself to arrest when she reported defendant's alleged kidnaping of her. That fact lent credence to White's allegations that defendant had drugs and guns in his house. The parole officers thus had enough evidence to support reasonable grounds to believe a parole violation had occurred. Indeed, in *Griffin*, the Court held that second hand information from a police officer that the defendant "had or might have guns" was enough to constitute reasonable grounds. 483 U.S. at 880–81, 107 S.Ct. at 3172–73.

Nor is it apposite that police accompanied the parole officers during their search of defendant's house. For safety purposes, "[a] parole officer ... may cause a police officer to accompany him when a search is being made." *Anderson, supra* at 305. The parole officers had an independent duty to investigate parole violations, and I cannot agree with defendant's suggestion that the parole officers were merely "stalking horses" for the police. So long as the parole officers had independent, reasonable grounds to believe parole violations had occurred, the search was valid.

Defendant argues that the standard analysis set forth above should not apply here because the defendant was arrested before the parole officers searched his house. Defendant contends that once he was arrested, the parole officers no longer had any interest in his supervision because he was no longer a danger to the community. Accordingly, defendant argues that the state no longer had a "special need" justifying the attenuation of his Fourth Amendment rights. I disagree.

I am not persuaded that the state's interest in determining whether defendant has violated the conditions of his parole automatically disappeared when defendant was taken into custody. Although any immediate threat to the community is abated when a parolee is taken into custody, the state has a continuing interest in determining in a timely fashion whether the parolee has violated the conditions of his parole. Only then will the parole officer and the parole board be equipped to decide whether revocation of parole is appropriate.

Importantly, the parole officer, in conducting a search pursuant to an investigation of the parole, has a duty to determine parole violations independent of the duty of the police to investigate new crimes. The state's interest in closely controlling its parolees is not undermined by defendant's arrest for a new violation as there is no guarantee that the defendant will remain in custody or that the police will continue to investigate or prosecute the newly alleged crime. Indeed, here, defendant was not prosecuted ultimately for kidnaping. The parole officer's power and duties arise out of the previous crime for which defendant has already been convicted. The parole officers here had reasonable grounds to believe that defendant was in possession of guns and drugs, both in violation of the conditions of his parole for a previous crime.

Defendant had a lessened expectation of privacy because of his parole, and it cannot follow that his expectation of privacy increases solely by virtue of his new arrest. His parole was not revoked automatically by his arrest, and he remained subject to the same conditions of parole. Indeed, had the parole officers searched defendant's house under the same circumstances but before the police arrested him, defendant would have no basis to support his motion. Nor is this a case where the parole officers were used by police to gather evidence necessary to support the arrest—the police already had a valid arrest warrant. Defendant's argument is semantics, nothing more.

Further, I need not decide whether the arrest warrant issued on the charges of kidnaping and assault was valid or relied upon in good faith by the police. Defendant stated in oral argument that this issue was not in dispute.

Accordingly, it is ORDERED that:

1. Defendant's motion to suppress is DENIED.