Thomas RINKER and Michelle: Rinker, his wife, individually and as parents and natural guardians of Chad Rinker, a minor, Plaintiffs,

v.

Paul J. SIPLER, Charles Middaugh, and Stroudsburg Area School District, Defendants.

No. 3:01 CV 1272.

United States District Court, M.D. Pennsylvania.

May 13, 2003.

John E. Freund, III, King, Spry, Herman, Freund & Faul, LLC, Bethlehem, PA, for defendants.

James A. Swetz, Cramer, Swetz & McManus, Stroudsburg, PA, for plaintiffs.

### MEMORANDUM

MUNLEY, District Judge.

Before the Court for disposition is defendants' motion for summary judgment. Plaintiffs Thomas Rinker and Michelle Rinker, his wife, individually and as parents and natural guardians of Chad Rinker, a minor, allege that defendants violated Chad Rinkers' rights under the Fourth and Fourteenth Amendments to the United States Constitution and seek relief pursuant to 42 U.S.C. § 1983. Plaintiffs also seek damages pursuant to common law claims of assault and battery. For the reasons that follow, we will grant defendants' motion for summary judgment on all of plaintiffs' federal claims. We decline to address plaintiffs' state law claims.

## I. Background

On February 7, 2001, Defendant Paul Sipler, the assistant principal at Stroudsburg Area Junior High School, ("SAJHS"), requested that Chad Rinker, ("Chad"), a student at SAJHS, come to his office.[1] Earlier on February 7, another student at SAJHS, Nabil Cristillo, told Sipler that "a kid" had marijuana on his school bus.[2] Cristillo and Chad rode the same bus to school. After Cristillo's report, Sipler and Charles Middaugh, a school security officer, pulled Chad out of his keyboarding class and escorted him to Sipler's office.

Once in Sipler's office, Sipler told Chad that another student had reported that Chad had marijuana on the school bus. Chad denied that he had marijuana on the bus, and Sipler did not name the informant when Chad asked who it was. During their conversation, Sipler found Chad to be somewhat incoherent, and claims that he looked stoned and smelled of marijuana. Middaugh also smelled marijuana on Chad. Sipler told Chad that he smelled like marijuana and that he was going to be searched.

After questioning Chad, Sipler ordered Middaugh to search him. The search took place in Sipler's office, which has three windows that look out on the exterior entrance of the building. The windows have coverings, but the coverings were open at the time of the search. At the direction of Sipler, Middaugh had Chad pull out his front and back pockets. Middaugh then placed his hands in Chad's pockets to make sure that there was nothing inside of them. Chad was then ordered to take off his socks and shoes, and a walking cast that he wore because of a recent ankle sprain. Nothing was discovered in Chad's socks or shoes. After he put his socks and shoes back on, Chad was told to lower his pants. He lowered his pants to his knees. Middaugh then ran his hands around the interior of Chad's boxer shorts to make sure nothing was hidden inside. Chad was not ordered to remove his boxers and did not do so. Again, nothing was found in the search.

After the search of Chad's clothing, Sipler searched Chad's bookbag and locker. No drugs were found. Sipler did find,

---

1. There is some confusion in the record over the date on which the events in question took place. The exact date is not crucial and we will assume that they occurred on February 7, 2001.

2. There is disagreement in the record over what Cristillo told Sipler. We will address that disagreement later in this opinion.

however, a notebook in Chad's bookbag that had drawings of mushrooms. This prompted Sipler to ask Chad whether he was doing mushrooms. Chad said that he was not doing mushrooms.

Next, Sipler called the school nurse in to check Chad's vital signs. She examined Chad's eyes and throat and had him perform some tests. She told Chad he looked stoned. Chad said he was not stoned. Immediately after the nurse's examination, however, Chad did give a written statement in which he admitted to smoking marijuana on Sunday night, four days before February 7, the day in question. Chad also stated that he had thrown away a marijuana "roach" that was in his coat pocket before boarding the school bus on February 7.

Sometime that morning, Chad's mother was called. She was told to come to the school in an hour. In the interim, Sipler asked Chad to give a sample for a urinalysis and he agreed to do so. Chad drank some water before attempting to give a urine sample. Middaugh gave Chad an additional drink of water and took him into a bathroom not usually open to students. The bathroom was smaller than that used by the students, having only one toilet and no urinals. As Chad attempted to produce a sample, Middaugh stood behind him. Chad was unable to urinate. Middaugh ran the water in the sink and is alleged to have splashed water on Chad's neck. Eventually, Chad was taken to a larger bathroom, one used by students, and produced a sample. The sample was later tested and came back negative.

Chad's mother, Michelle Rinker, ("Ms.Rinker"), was now at the school. Sipler asked her to sign a waiver of expulsion hearing form. Ms. Rinker refused to sign the form and alleges that Sipler told her that Chad would be expelled regardless of whether she signed the hearing

waiver form. Ms. Rinker and Chad then left the school. Chad's father, Thomas Rinker, ("Mr.Rinker"), later came to the school to find out why Chad had been expelled. Mr. Rinker alleges that Sipler also told him that Chad would be expelled regardless of whether a hearing was held. He further alleges that Sipler said the police would be called in to investigate if a hearing were held.

In the end, Stroudsburg Area School District decided not to expel Chad. In a letter dated February 9, 2001, Sipler informed the Rinkers that Chad was assigned an out-of-school-suspension often (10) days, beginning February 8. Ms. Rinker states that the February 9 letter was postmarked February 12 and not received until February 13 or 14. Defendants claim that they left two or three messages regarding their decision to suspend, instead of expel, Chad on the Rinkers' answering machine. The Rinkers allege that these messages were left after February 14. In the meantime, the Rinkers enrolled Chad in a private school, Messiah Christian Academy, on February 14, believing that he had been expelled from SAJHS.

On July 9, 2001, the plaintiffs filed the instant complaint, seeking damages for violation of the Fourth and Fourteenth Amendments to the United States Constitution and the common law torts of assault and battery. Oral argument was held on defendants' ensuing motion for summary judgment on October 28, 2002, bringing the case to its present posture.

## II. Jurisdiction

The Court exercises jurisdiction over this dispute pursuant to its federal question jurisdiction, 28 U.S.C. § 1331, and supplemental jurisdiction, 28 U.S.C. § 1367. Pennsylvania law applies to those claims considered pursuant to supplemental jurisdiction. *United Mine Workers of*

*America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

### III. Standard of Review

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Knabe v. Boury,* 114 F.3d 407, 410 n. 4 (3d Cir.1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. *International Raw Materials, Ltd. v. Stauffer Chem. Co.,* 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (1986). A fact is material when it might affect the outcome of the suit under the governing law. *Id.* Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once

the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

### IV. Discussion

■ Plaintiffs seek relief pursuant to 42 U.S.C. § 1983 for alleged violations of the Fourth and Fourteenth Amendments to the United States Constitution. Section 1983 states, in relevant part:

> Every Person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983. Thus, section 1983 is not itself a source of substantive rights. *Graham v. Connor,* 490 U.S. 386, 393–394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Instead, it provides a cause of action for the vindication of federal rights. *Id.* To succeed under section 1983, plaintiffs must establish: 1) that defendants violated a right secured by the Constitution or laws of the United States, 2) acted under color of state law in so doing, and 3) damages. *Sameric Corp. v. City of Philadelphia,* 142 F.3d 582, 590 (3d Cir.1998). There is no dispute that defendants acted under color of state law in this matter. Whether there is sufficient evidence to support plaintiffs' claims that defendants violated the Fourth and Fourteenth Amendments remains for resolution.

## A. Unreasonable Search

██ Plaintiffs allege that defendants violated the Fourth and Fourteenth Amendments when they searched Chad's person, possessions, and locker. Plaintiffs further allege that defendants violated Chad's Fourth and Fourteenth Amendment rights when they collected a urine sample from him. The Fourth Amendment, by incorporation through the Fourteenth Amendment, "prohibits unreasonable searches and seizures by state officers." *New Jersey v. T.L.O.*, 469 U.S. 325, 334, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). Public school officials are state officers and are thereby bound by the Fourth Amendment's prohibition against unreasonable searches and seizures. *Id.*

██ In the school context, "the legality of a search ... depend[s] simply on the reasonableness, under all the circumstances, of the search." *Id.* at 341, 105 S.Ct. 733. A search is reasonable if it was justified at its inception, and its scope is reasonably related to its objectives. *Id.* As the *T.L.O.* court explained:

> Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* at 341–42, 105 S.Ct. 733. We will apply this reasoning to plaintiffs' Fourth Amendment claims.

### 1. The Search of Chad's Person, Possessions, and Locker

With regard to their Fourth Amendment claim concerning the search of Chad's person, possessions, and locker, plaintiffs argue that summary judgment is precluded because there is a factual and material dispute over Cristillo's report to Sipler and whether that report gave Sipler an individualized suspicion that Chad may have been in possession of marijuana. Although a factual dispute does exist over Cristillo's report to Sipler, we conclude that it is not material and therefore not an impediment to judgment on the search of Chad's person, possessions, and locker.

██ In-school searches are usually based upon some level of individualized suspicion; probable cause, however, is not a necessary predicate for an in-school search. *Id.* at 341–42 n. 8, 105 S.Ct. 733. In *T.L.O.*, for example, the Supreme Court upheld a search of a student's purse after a teacher caught the student smoking in a lavatory, thus giving rise to an individualized suspicion that the student had violated school rules. 469 U.S. at 347–48, 105 S.Ct. 733. Similarly, in *Hedges v. Musco,* the United States Court of Appeals for the Third Circuit upheld the medical examination of a student after her teacher noticed that she was acting oddly, and had glassy, red eyes with dilated pupils. 204 F.3d 109, 117 (3d Cir.2000). The court ruled that these facts gave the teacher a " 'particularized and objective basis for suggesting that [the student] be examined by the school nurse.' " *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

██ The Supreme Court made no definitive ruling in *T.L.O.* on whether individualized suspicion was a prerequisite of a reasonable student search; but it did note that exceptions to the general requirement of individualized suspicion have been made

only in those cases where "the privacy interests implicated by the search are minimal and where 'other safeguards' are available 'to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field.'" *Id.* at 341 n. 7, 105 S.Ct. 733 (quoting *Delaware v. Prouse,* 440 U.S. 648, 654–55, 99 S.Ct. 1391 (1979)). There is no reason in this case to make an exception to the general requirement of individualized suspicion. A student, like any other person, has a substantial privacy interest in his body and in his belongings carried in a bag or other closed container. *Id.* at 337–38, 105 S.Ct. 733.

Defendants had an individualized suspicion that Chad may have been in possession and/or under the influence of marijuana. Plaintiffs correctly argue that there is a factual dispute over what Cristillo told Sipler regarding marijuana on the school bus on the morning of February 8. Sipler states in his deposition that Cristillo told him that Chad had been smoking marijuana on the bus. (Doc. 21, Ex. 4 at 24–25). For his part, Cristillo states that he told Sipler only that someone had marijuana on the school bus that morning, and that the bus smelled of marijuana. (Doc. 21, Ex. 3 at 11–13).

Whatever the truth may be regarding Cristillo's statement, we hold that because it did not serve as the basis for Sipler's search of Chad, it is not material to the reasonableness of that search. At the very least, Cristillo told Sipler that there was marijuana on the school bus. (Doc. 21, Ex. 3 at 11). As noted earlier, Chad and Cristillo rode the same bus to school. (Doc. 21, Ex. 2 at 18). Accordingly, Cristillo's report gave Sipler reasonable suspicion to question students on that bus. That suspicion led him to question Chad

and two other students. (Doc. 21, Ex. 2 at 70–71). It did not, however, lead him to immediately order a search of Chad.

■■■ Sipler ordered Middaugh to search Chad only after he had questioned him and observed that he looked stoned, smelled of marijuana, and was somewhat incoherent. (Doc. 21, Ex. 5 at 16, Ex. 4 at 33–35). These observations gave Sipler an individualized suspicion that Chad may be in possession and/or under the influence of marijuana. Consequently, Sipler's decision to subsequently order a search of Chad, his possessions, and locker was reasonable at its inception under the *T.L.O.* standard.

■■■ In addition to being reasonable at its inception, the search of Chad was permissible in its scope. Plaintiffs object that the scope of the search of Chad's person was unreasonable.[3] They argue that a search is reasonable in scope only insofar as evidence gathered during initial, minimally intrusive stages warrants further, more intrusive searching, and they note that in this case no evidence of drug possession was discovered during the earliest stages of the search. In support of their position that escalating searches are the only permissible school searches, plaintiffs cite the Supreme Court's *T.L.O.* decision and the Third Circuit's ruling in *Hedges.*

We do not read either *T.L.O.* or *Hedges* as holding that escalating searches are the only types of searches permissible in the school context. As touched upon above, *T.L.O.,* involved a teacher who found a student smoking in the lavatory and took the student to the vice principal's office. *T.L.O.,* 469 U.S. at 328, 105 S.Ct. 733. The vice principal searched the student's purse and found a pack of cigarettes. *Id.* When

---

**3.** Plaintiffs do not appear to object to the scope of the search of Chad's possessions and locker, and we find no constitutional violation in defendants actions in this regard.

removing the cigarettes, the vice principal noticed a package of rolling papers. *Id.* The vice principal then proceeded to search other areas of the purse, finding marijuana, drug paraphernalia, and evidence of drug dealing. *Id.* The Supreme Court approved of the scope of this search, holding that it reasonably escalated with the evidence found at each point in the search. *Id.* at 347–48, 105 S.Ct. 733. In *Hedges,* the Third Circuit also upheld an escalating search where initial observation, an examination by a school nurse, and a bookbag search warranted a later urinalysis and blood test. *Hedges,* 204 F.3d at 117–21.

Although the *T.L.O.* and *Hedges* courts upheld escalating searches they did not hold that such searches are the only searches that are constitutionally permissible. A search, as discussed before, is to be evaluated by the totality of the circumstances. *T.L.O.,* 469 U.S. at 341, 105 S.Ct. 733; *Hedges,* 204 F.3d at 116. It is reasonable in scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.,* 469 U.S. at 341–42, 105 S.Ct. 733.

In this case, Sipler had a reasonable basis to suspect that Chad may have been in possession of marijuana. In response to that valid suspicion, he ordered a search of Chad's person. That search moved from Chad's pockets, to his socks and shoes, and then on to Chad dropping his pants to his knees while Middaugh searched the waistband around his boxer shorts. (Doc. 21, Ex. 2 at 27–30). These actions were reasonably related to the objective of discovering whether Chad had marijuana on his

person. Chad was not nude during the search and no women were present; his genitals were not exposed or examined,[4] and he was not touched inappropriately. *Id.* Because Sipler ordered him to drop his pants, Chad felt uncomfortable during the search; but his understandable discomfort does not make defendants' actions unreasonable under the Fourth Amendment. *Id.* at 29. Accordingly, we hold that defendants physical search of Chad was reasonable in its scope given its objective and Chad's sex and age.

■ In a variation of their escalating search position, plaintiffs contend that defendants should not have physically searched Chad until after a medical examination had been conducted and revealed suspected drug use. Plaintiffs cite *Hedges* and *Sostarecz v. Misko,* 1999 WL 239401 (E.D.Pa. March 26, 1999), in support of their position. *Hedges,* as noted, upheld a blood test and urinalysis after an examination by a school nurse provided reason to believe that the student was under the influence of alcohol or another drug. *Hedges,* 204 F.3d at 117–120. In *Sostarecz,* a district court held that a physical search of plaintiff's leg for drug use was not warranted after a school nurse found no clinical signs that plaintiff was under the influence of a controlled substance. *Sostarecz,* 1999 WL 239401, at *6.

Neither of these cases supports plaintiffs' position that a medical evaluation was required before defendants conducted a physical search of Chad. In both *Hedges* and *Sostarecz* the students in question were suspected of being under the influence of a controlled substance. *Hedges,* 204 F.3d at 112; *Sostarecz,* 1999 WL 239401, at *1. There is no mention in ei-

---

4. Plaintiffs state in their complaint that Middaugh expanded the waistband of Chad's boxer shorts and viewed his genitals. They do not state this is their brief in opposition to defendants' motion for summary judgment, and we have found no evidence in the record that Middaugh visually examined Chad's genitals. *See* Doc. 21, Ex. 2 at 27–30.

ther of those cases that the students were thought to be in possession of such a substance before they were examined.[5] Accordingly, under the circumstances prevailing in *Hedges* and *Sostarecz*, it was entirely appropriate for the defendants to have the students examined by their school nurses.

In this case, on the other hand, Sipler suspected that Chad may have been in possession and/or under the influence of marijuana. Sipler was justified, therefore, in conducting either a physical search of Chad or having a medical examination performed. Given his suspicions that Chad was under the influence of marijuana, it may have been wiser to have had Chad examined by the school nurse before a physical search occurred; nonetheless, we cannot say that his failure to do so makes the physical search of Chad unreasonable under the Fourth Amendment. Sipler smelled marijuana on Chad. He had sufficient reason to order a physical search without a preliminary medical exam. As stated earlier, a student search is evaluated under a totality of circumstances standard. *T.L.O.*, 469 U.S. at 341, 105 S.Ct. 733. The circumstances prevailing in this case did not require defendants to conduct a medical exam before a physical search. Defendants' actions were reasonable.

### 2. Urinalysis

Plaintiffs argue that defendants collected a urine sample from Chad in a constitutionally unreasonable manner.[6] The collection of urinalysis samples intrudes upon the great privacy shielding

excretory functions. *Hedges*, 204 F.3d at 119. Whether the collection of such a sample violates the Fourth Amendment depends on " 'the manner in which production of the urine sample is monitored.' " *Id.* (quoting *Vernonia School Dist. v. Acton*, 515 U.S. 646, 658, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)).

Here, Chad consented to provide a urine sample. (Doc. 21, Ex. 2 at 37). He drank water at the request of Middaugh and then went into a small bathroom not usually open to students. *Id.* at 38–39. The bathroom had one toilet stall in it, and Middaugh stood behind Chad as he tried to urinate. *Id.* at 40–41. At first, Chad could not urinate. *Id.* at 41. Middaugh told him to run water on his wrists. *Id.* While he was trying to urinate, Middaugh splashed water on Chad's neck and ran the sink faucet. *Id.* He also had Chad drink more water at some point.[7] *Id.* After his first unsuccessful attempt, defendants took Chad to a larger, student bathroom where Middaugh again stood behind him. This time Chad produced a urine sample. *Id.*

At its core, this incident has Middaugh standing behind Chad in two different bathrooms. In this regard, there is nothing unreasonable in Middaugh's actions. In a seeming effort to speed the process along, Middaugh also ran the sink faucet and had Chad drink and run water on his wrists. Although probably unnecessary, there is nothing highly intrusive in these actions. Finally, Middaugh splashed water on Chad's neck as he stood behind him. This last act was certainly unnecessary; but it does not rise to the level of a Fourth

---

5. The student in *Hedges* was found to be in possession of two unidentified pills; however, these pills were discovered after she was examined by the school nurse. *Hedges*, 204 F.3d at 119.

6. Plaintiffs do not argue that the urinalysis was unjustified at its inception.

7. Middaugh denies that he did anything to aid Chad in urinating. Nonetheless, for the purposes of summary judgment, we accept Chad's rendition of the facts.

Amendment violation. It did not intrude on the essential level of privacy found in a public bathroom. Accordingly, we hold that defendants monitoring of the urinalysis sample did not violate the Fourth Amendment.

### B. Procedural Due Process

■ Plaintiffs allege that defendants violated Chad's Fourteenth Amendment rights to procedural and substantive due process when they suspended him from school. Defendants move for judgment on plaintiffs' due process claims, arguing that Chad received all process he was due for his ten (10) day suspension.

■ School age children in Pennsylvania, such as Chad, have a state created property interest in a public school education. *Agostine v. School Dist.*, 106 Pa.Cmwlth. 492, 527 A.2d 193, 196 (1987). State created property interests receive the protection of the Fourteenth Amendment's Due Process Clause. *Goss v. Lopez*, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576–577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Thus, Chad's right under Pennsylvania law to attend a public school could be rescinded only after requisite due process. *Goss*, 419 U.S. at 574, 95 S.Ct. 729.

The parties differ over what procedural process Chad was due in this case in that they disagree over what ultimate disciplinary action defendants took with respect to Chad's alleged use and/or possession of marijuana. They agree that Chad was suspended ten (10) days, and plaintiffs make no claim that he did not receive due process with regard to his suspension. Plaintiffs argue, however, that defendants ultimately punished Chad by effectively expelling him from SAJHS without a required hearing and thereby violated the procedural component of the Due Process Clause. Defendants deny that Chad was expelled from school.

Viewing the facts in a light most favorable to plaintiff, as we must, we hold that defendants did not expel Chad from school; instead they suspended him for ten (10) days, and consequently their actions did not violate the Procedural Due Process Clause. On February 7, Ms. Rinker was called to SAJHS. When she arrived at the school, Sipler described the situation to her. He told her that Chad was suspended for ten days and gave her a completed discipline notice. (Doc. 21, Ex.8 at 18–20). The notice states that Sipler punished Chad with ten days of out-of-school suspension to begin on February 8, 2001, and that the matter would be referred to drug/alcohol and law enforcement officials. (Doc. 21, Ex. 8, at Ex.1). Further, the notice states that an expulsion hearing would be required before Chad could be expelled from SAJHS. *Id.*

Ms. Rinker says that Sipler told her that Chad would never be permitted to return as a student to SAJHS, and she left the meeting thinking that Chad had been effectively, if not officially, expelled from school. (Doc. 21, Ex. 8 at 18–21, 25). A reading of Ms. Rinker's deposition reveals that the conversation she had with Sipler left her somewhat confused. *Id.* at 21. Nevertheless, Ms. Rinker's deposition confirms that Sipler informed her, both orally and in writing, that Chad had been suspended and that a hearing or waiver would be necessary before any expulsion. *Id.* at 18–21.

Mr. Rinker also believed that Sipler had effectively expelled Chad from SAJHS. (Doc. 21, Ex. 9 at 14). Mr. Rinker went to SAJHS on February 9, 2001 to speak with Sipler about Chad's situation. *Id.* at 10. During their meeting, Sipler told Mr. Rinker that Chad could be expelled from

school only after a hearing before the school board or after the Rinkers had waived such a hearing. *Id.* at 12. Still, Mr. Rinker appears to have been under the impression that Chad had been expelled without a hearing or waiver of hearing. *Id.* at 14.

Neither Sipler's rash statement that Chad would never return to SAJHS, nor the Rinkers' apparent confusion over whether Chad had already been expelled without a hearing or waiver thereof create a procedural due process violation. Despite the lack of verbal tact and understanding between the parties, Sipler gave Ms. Rinker a discipline notice regarding Chad's punishment on the morning of February 7.[8] As discussed above, that notice states that an expulsion hearing was required before Chad could be expelled. The Rinkers also received an official suspension notice letter, dated February 9, 2001, by February 14. That letter, signed by Sipler, states that Chad had been suspended for ten days, not expelled. (Doc. 21, Ex. 2 at Ex. 8; Doc. 21, Ex.8 at 28). The suspension letter further states that Chad could return to SAJHS on February 27, 2001. (Doc. 21, Ex. 2 at Ex. 8). Thus, the Rinkers had written notice that Chad had not been expelled at least twelve calendar days and potentially eight school days before his suspension ran.[9] Both Rinkers acknowledge receipt of the discipline and suspension notices. (Doc. 21, Ex. 8, at 18–19, 27–28; Doc. 21, Ex. 9 at 13–14.)

The undisputed record, therefore, reveals that the Rinkers were notified that Chad would be entitled to a hearing before the Stroudsburg Area School Board before he could be expelled from SAJHS. Furthermore, the Rinkers knew by February 14 that Chad had been suspended from SAJHS and would not be expelled. All of this took place a considerable time before Chad's ten day suspension ran. Consequently, there is simply no *de facto* expulsion here that could give rise to a due process violation, and we will grant defendants' motion for summary judgment on plaintiffs' procedural due process claim.[10]

## C. Equal Protection

 The Rinkers allege that defendants violated the Equal Protection Clause by treating Chad differently than other similarly situated persons. They claim that defendants impermissibly searched and punished Chad while two other students questioned about marijuana use and/or possession on the school bus were not searched or punished. At its heart the Equal Protection Clause is designed " 'to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' ' *Sioux City Bridge Co. v. Dako-*

---

8. The notice is dated February 8, however, as mentioned in note 1, we operate under the assumption that Chad was accused of marijuana use/possession on February 7. Whatever the case me be, it is clear from Ms. Rinker's deposition that Sipler gave her the discipline notice on the morning she came to SAJHS.

9. Sipler's February 9, 2001 letter to the Rinkers states that Chad's suspension will be for ten days and run from February 8, 2001 to February 26, 2001. Days on which the SAJHS were closed did not count toward

suspension. It is not clear from the record which days between February 8 and February 26 counted toward fulfilling Chad's ten day suspension.

10. In their complaint, the Rinkers also allege a substantive due process claim. We find no facts in the record to support such a claim. Moreover, at oral argument on this motion, the Rinkers acknowledged that they had no viable substantive due process claim. Notes of Testimony, October 28, 2002, p. 32.

*ta County,* 260 U.S. 441, 445, 43 S.Ct. 190, 67 L.Ed. 340 (quoting *Sunday Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 352, 38 S.Ct. 495, 62 L.Ed. 1154, (1918)).

As we discussed before, Sipler's search of Chad was triggered by sufficient individualized suspicion. The results of that search, particularly the school nurse's exam, and Chad's admission that he had marijuana on his person when he was near the school bus stop, gave Sipler rational grounds for suspending Chad. There is no evidence before us that Sipler singled Chad out for punishment. Accordingly, we will grant defendants' motion for summary judgment on plaintiffs' equal protection claim.

### D. Familial Integrity

The Rinkers allege that defendants' effectively expelled Chad from SAJHS and thereby deprived them of their right to familial integrity under Fourteenth Amendment. As we have already ruled, defendants did not expel Chad from school. Defendants' actions did not interfere with the Rinkers' right to have Chad return to SAJHS after the completion of his suspension. We will grant defendants' motion for summary judgment on the Rinkers' familial integrity claim.

### V. Conclusion

For the foregoing reasons, we will grant defendants' motion for summary judgment on the Rinkers' unreasonable search, due process, equal protection, and familial integrity claims. Given our analysis, we need not address *Monell* liability or punitive damages. We decline to address the Rinkers' state law claims of assault and battery without prejudice to further action

in state court. An appropriate order follows.