LOGUE, J.
Based upon an anonymous tip to a gun bounty program that K.P. was carrying a firearm, the assistant principal of his high school took possession of his book bag, removed him from a classroom full of students, and escorted him to the principal’s conference room. A search of the book bag revealed a loaded, semi-automatic handgun. K.P. appeals the denial of his motion to suppress the evidence of the firearm, arguing that the search of his book bag violated his Fourth Amendment right to be free from unreasonable searches.
Admittedly, an anonymous tip like the one at issue may not constitute a sufficiently reliable indicator that a crime was occurring to justify a search of K.P. by police officers on a public street. However, the level of reliability required to justify a search is lower when the tip concerns possession by a student of a firearm in a public school classroom. The Fourth and Fourteenth Amendments require that searches be reasonable in light of all the circumstances. Here, the lower level of reliability reflected in such an anonymous tip is more than offset because (1) a student’s expectation of privacy in the school setting is reduced, and (2) the government’s interest (protecting the vulnerable population of children assembled within the confines of the school from a firearm) is heightened. We therefore reject K.P.’s arguments and uphold the decision of the court below.
FACTS AND PROCEDURAL BACKGROUND
On October 12, 2011, the Miami-Dade County Police Department Gun Bounty Program received an anonymous tip that K.P., a student at Miami Northwestern Senior High School, was possibly in possession of a firearm. After being informed of this tip, a school resource officer, employed by the Miami-Dade County Schools Police Department and assigned to the high school, confirmed that K.P. attended the school after searching for his name in an electronic public school database system. The officer then notified the assistant principal and school security guards of the tip.
The assistant principal and two school security guards went to KP.’s classroom, took possession of KP.’s book bag, and escorted K.P. to the principal’s conference room. Upon entering the room, the assistant principal handed over the book bag to the school resource officer. The officer opened the book bag and discovered a loaded, semi-automatic handgun.
K.P. was subsequently charged as a juvenile with carrying a concealed weapon, possession of a firearm on school grounds, and possession of a firearm by a minor. He moved to exclude the handgun from evidence, arguing that the search of his book bag violated his Fourth Amendment right to be free from unreasonable searches and seizures. The trial court denied the motion. Following a bench trial, *1125 the trial court withheld adjudication and imposed fifteen days in secure detention and one year of probation. This appeal followed.
ANALYSIS
A. The Fourth Amendment and Anonymous Tips.
The Fourth Amendment to the United States Constitution states, “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.” Because the “central inquiry under the Fourth Amendment” is “reasonableness in all the circumstances,” Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), no single level of reliability applies in every situation. “Neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance.” Nat’l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). As discussed in this section, a substantial body of law addresses the level of reliability that an anonymous tip must demonstrate in order to justify a search under the Fourth Amendment. In this regard, the level of reliability that an anonymous tip must demonstrate in order to satisfy the Fourth Amendment is lower both when an extraordinary danger is threatened and where legitimate expectations of privacy are reduced.
Anonymous tips, which are more susceptible to abuse than a tip by a known informant, may be less reliable than other investigative leads. Florida v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). The government’s interest in conducting a search based upon an anonymous tip, therefore, is usually measured by examining the tip’s “indicia of reliability.” Id. Generally, a search based upon an anonymous tip withstands scrutiny under the Fourth Amendment only if the tip contains sufficient details and information that can be independently corroborated by the police to establish a level of reliability regarding the information in the tip. Id. at 270-71, 120 S.Ct. 1375. In the words of a noted jurist and scholar in this area, the anonymous tip must show “that the tipster has some inside knowledge about the suspect, and that the tipster’s accusation of illegal activity is entitled to some credence.” Phillip A. Hubbart, Making Sense of Fourth Amendment Law: A Fourth Amendment Handbook 197 (2005).
In the case of Alabama v. White, 496 U.S. 325, 332, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), for example, the Court held that an anonymous tip was sufficient to justify an investigative stop that led to a consensual search of a vehicle which uncovered marijuana. The Court focused on the extensive, predictive details regarding the suspect’s appearance, automobile, time of departure, and route included in the tip that allowed the police to test the informant’s knowledge and credibility. Id. at 331-32, 110 S.Ct. 2412. When the police were able to verify this information, the Court explained, they had “reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.” Id. at 332, 110 S.Ct. 2412.
In contrast, the Court later held an anonymous tip did not provide sufficient corroborating detail to justify an investigative stop and frisk on a public street when the tip consisted entirely of a statement that an African-American youth standing at a certain bus stop wearing a plaid shirt was carrying a gun. J.L., 529 U.S. at 271-72, 120 S.Ct. 1375. The Court held that the tip must be reliable, not only to identi *1126 fy the suspect, but also to indicate the crime was being committed: “[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.” Id. at 272, 120 S.Ct. 1375. A tip that does no more than accurately describe a suspect’s readily observable location and appearance on a public street is insufficient to pass Fourth Amendment muster because it fails to “show that the tipster has knowledge of concealed criminal activity.” Id.
When weighing the legitimacy of the government’s interest to conduct a search based upon the anonymous tip in J.L., the Court focused largely on the reliability of the information used by the officer to decide to initiate the stop and frisk. Id. at 271, 120 S.Ct. 1375. For this reason, the Court in J.L. expressly declined to make “an automatic firearm exception to our established reliability analysis,” whereby a stop and frisk would always be justified by any anonymous tip indicating a person was carrying a firearm. Id. at 272, 120 S.Ct. 1375. “Firearms are dangerous ... [but] the Fourth Amendment is not so easily satisfied.” Id. at 273, 120 S.Ct. 1375.
Nevertheless, it would be wrong to read J.L. as establishing an irreducible minimum of reliability that applies to all anonymous tips in all circumstances, and regardless of the extent of the threat that the tip revealed. Although the Court in J.L. set forth a required level of reliability needed for an anonymous tip to justify a stop and frisk' on a public street, the Court was careful to note the Fourth Amendment did not establish a minimum level of reliability required in all circumstances.
In fact, the Court expressly recognized that there may be circumstances justifying “protective searches on the basis of information insufficient to justify searches elsewhere.” Id. at 274, 120 S.Ct. 1375. For example, “extraordinary dangers sometimes justify unusual precautions.” Id. at 272, 120 S.Ct. 1375. In other words, the Court recognized that a search may be justified under the Fourth Amendment based upon an anonymous tip reflecting a lesser level of reliability than the tip in J.L. if the tip concerned a greater danger than possession of a firearm on a public street. The Court noted:
The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk.
Id. at 273-74, 120 S.Ct. 1375.
Under this line of authority, federal and state courts have routinely upheld searches targeting specific individuals based upon anonymous tips containing less indicia of reliability than that involved in J.L. when the government interest was more immediate, substantial, and grave than the interest involved in J.L.[1] Indeed, *1127 where the danger is sufficiently substantial, and other factors are met, a search may satisfy the Fourth Amendment even when there is no individualized suspicion.[2]
In addition, the Court in J.L. explained that the level of reliability that it established for the anonymous tip in J.L. was not necessarily intended to apply in schools:
Nor do we hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports and schools, cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere.
Id. at 274, 120 S.Ct. 1375 (internal citations omitted); see also J.L. v. State, 727 So.2d 204, 209 n. 5 (Fla.1998) (Harding, J., concurring), aff'd, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (noting that the result of J.L. “might have been different had the frisk been conducted by a school official on school grounds”).
In recognizing that schools are one of the “quarters where the reasonable expectation of Fourth Amendment privacy is diminished” such that “public safety officials” may well “conduct protective searches on the basis of information insufficient to justify searches elsewhere,” the Court merely acknowledged well-established precedent, which we discuss in the next section.
B. The Fourth Amendment in Schools.
Any analysis of a search in a school must begin with the principle that the school setting “requires some modification of the level of suspicion of illicit activity needed to justify a search.” New Jersey v. T.L.O., 469 U.S. 325, 340, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). In the leading case of T.L.O., the United States Supreme Court held that searches by school officials in public schools “should depend simply on the reasonableness, under all of the circumstances, of the search.” Id. at 341, 105 S.Ct. 733. Thus, the search of a student on school grounds is not governed by probable cause, but is instead governed by the less demanding standard of reasonable suspicion. Id.; State v. D.S., 685 So.2d 41, 43 (Fla. 3d DCA 1996). This is also the standard that applies to a stop and frisk on a street. Terry, 392 U.S. at 30, 88 S.Ct. 1868.
In T.L.O., an assistant principal of a high school searched a student’s purse for cigarettes (which were forbidden on school grounds) based upon a teacher’s observation that the student was smoking in a lavatory. 469 U.S. at 328, 105 S.Ct. 733. The assistant principal found marijuana, and the student ultimately confessed to selling the drug at school. Id. at 328-29, 105 S.Ct. 733. The student subsequently moved to suppress the contraband and confession. Id. at 329, 105 S.Ct. 733.
The Court concluded that the search of the student’s purse “was in no *1128 sense unreasonable for Fourth Amendment purposes.” Id. at 343, 105 S.Ct. 733. In doing so, the Court held that a child did not waive his or her “rights to privacy in such items merely by bringing them onto school grounds.” Id. at 339, 105 S.Ct. 733. An invasion of privacy results from a “search of a child’s person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult.” Id. at 337-38, 105 S.Ct. 733.
The Court, however, also held that the-child’s legitimate expectation of privacy must be weighed against the interest of the school to maintain order and, pertinent to the instant case, to protect children from violence in schools:
Against the child’s interest in privacy must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds. Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems.
Id. at 339, 105 S.Ct. 733 (emphasis added).
In Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 664-65, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), the Court returned to application of the Fourth Amendment to searches in schools when it held that a public school could require students playing interscholastic sports to undergo random drug tests without any individualized suspicion of wrongdoing. “As the text of the Fourth Amendment indicates,” the Court reasoned, “the ultimate measure of the constitutionality of a governmental search is ‘reasonableness.’ ” Id. at 652, 115 S.Ct. 2386. And “whether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual’s Fourth Amendment interests against its promotion of legitimate governmental interests.” Id. at 652-53, 115 S.Ct. 2386 (internal quotation omitted).
When balancing these considerations, the Court emphasized that students in school generally have a “decreased expectation of privacy.” Id. at 664, 115 S.Ct. 2386. “Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere.” Id. at 656, 115 S.Ct. 2386. The relationship of the school to the student is “custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults.” Id. at 655, 115 S.Ct. 2386. Therefore, “while children assuredly do not shed their constitutional rights ... at the schoolhouse gate, the nature of those rights is what is appropriate for children at school.” Id. at 655-56, 115 S.Ct. 2386 (internal citation and quotation omitted).
In weighing the “severity of the need” for a search, moreover, the Court also made clear that the nature of the government interest is not “a fixed, minimum quantum of governmental concern, so that one can dispose of a case by answering the question in isolation: is there a compelling state interest?” Id. at 661, 115 S.Ct. 2386. Instead, the Court held, “the phrase describes an interest that appears important enough to justify the particular search at hand.” Id. Nor was the government’s legitimate interest contingent upon a predetermined, minimum level of suspicion: “[t]he school search we approved in T.L.O., while not based on probable cause, was based on individualized suspicion of wrongdoing. As we explicitly acknowledged, however, the Fourth Amendment imposes no irreducible requirement of such suspicion.” Id. at 653, 115 S.Ct. 2386 (internal quotation omitted).
Balancing “the decreased expectation of privacy, the relative unobtrusiveness of the *1129 search, and the severity of the need,” the Court concluded that requiring students playing interscholastic sports to undergo random drug tests was reasonable even without individualized suspicion of wrongdoing. Id. at 664-65, 115 S.Ct. 2386. “[Wjhen the government acts as guardian and tutor the relevant question is whether the search is one that a reasonable guardian and tutor might undertake. Given the findings of need made by the District Court, we conclude that in the present case it is.” Id. at 665, 115 S.Ct. 2386.[3]
The dangers involved in T.L.O. and Acton were cigarette or drug use. The threat of a student carrying a firearm on school grounds obviously presents a more immediate and grave threat to the lives of students.
C. The Threat of Gun Violence in Schools.
The need to protect children in schools from violence rests not only on common sense — on “what every parent knows”— but has been expressly recognized by the highest court in the land.
As noted above, the majority opinion in T.L.O. is based upon the recognition of the need for school officials to address “violence in the schools.” In concurring, Justice Powell, joined by Justice O’Connor, placed even greater reliance than the majority on the importance of protecting teachers and students from the rising levels of crime in schools:
[Ajpart from education, the school has the obligation to protect pupils from mistreatment by other children, and also to protect teachers themselves from violence by the few students whose conduct in recent years has prompted national concern.
T.L.O., 469 U.S. at 350, 105 S.Ct. 733 (Powell, J., concurring).
Justice Blackmun’s concurrence in T.L.O. also emphasized the need for a lower Fourth Amendment standard in schools to protect students and teachers from violence:
[Government has a heightened obligation to safeguard students whom it compels to attend school. The special need for an immediate response to behavior that threatens either the safety of school children and teachers or the educational process itself justifies the Court in excepting school searches from the warrant and probable-cause requirement, and in applying a standard determined by balancing the relevant interests.
Id. at 353, 105 S.Ct. 733 (Blackmun, J., concurring).
Justice Stevens dissented in T.L.O., in part because the decision authorized a search of a purse for cigarettes, and therefore reduced Fourth Amendment protections for “even the most trivial school regulation or precatory guideline for student behavior.” Id. at 377, 105 S.Ct. 733 (Stevens, J., dissenting). Justice Stevens contrasted such “trivial” problems, which he believed did not justify a lower Fourth Amendment standard, with violence in the schools, which he believed would:
*1130 Violent, unlawful, or seriously disruptive conduct is fundamentally inconsistent with the principal function of teaching institutions which is to educate young people and prepare them for citizenship. When such conduct occurs amidst a sizable group of impressionable young people, it creates an explosive atmosphere that requires a prompt and effective response.
Id. at 376, 105 S.Ct. 733.
The Supreme Court’s recognition in T.L.O. of the government’s interest in addressing “violent crime in the schools” may appear almost prescient. “Judges cannot ignore what everybody else knows: violence and the threat of violence are present in the public schools_ The incidences of violence in our schools have reached alarming proportions.” State v. J.A., 679 So.2d 316, 320 (Fla. 3d DCA 1996) (internal citation and quotation omitted) (approving random classroom searches of high school students with hand-held metal detector wands). Since T.L.O. was written, our Country has experienced an outbreak of catastrophic mass shootings of children in schools.[4] In light of this grim development, no reasonable person would contest that the government’s interest in protecting students from gun violence is entitled to substantial weight when deciding whether a particular search at a school is reasonable under all of the circumstances.
D. The Search of K.P.’s Book Bag Was Reasonable.
Was the anonymous tip that a named student in a certain school possibly possessed a gun enough to justify the *1131 search of KP.’s book bag? Applying the law discussed above, we hold that it was.
1. Expectation of Privacy.
First, while K.P. had a reasonable expectation of privacy in the contents of his book bag on school property, T.L.O., 469 U.S. at 339, 105 S.Ct. 733, KP.’s expectation of privacy was tempered by the special characteristics of the school setting. Schools are one of the “quarters where the reasonable expectation of Fourth Amendment privacy is diminished” such that “public safety officials” may well “conduct protective searches on the basis of information insufficient to justify searches elsewhere.” J.L., 529 U.S. at 274, 120 S.Ct. 1375; see also Bd. of Educ. v. Earls, 536 U.S. 822, 830, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (“A student’s privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health and safety.”); T.L.O. 469 U.S. at 348, 105 S.Ct. 733 (Powell, J., concurring) (noting “the special characteristics of elementary and secondary schools that make it unnecessary to afford students the same constitutional protections granted adults and juveniles in a non-school setting”).
2. Intrusiveness of Search.
Second, the search was only moderately intrusive. The search of a book bag carried onto school grounds is certainly invasive. Some book bags will contain children’s personal diaries, letters, photographs, items of personal hygiene, or other effects of a private nature whose public disclosure could offend a student’s reasonable expectations of privacy. Here, however, the search of KP.’s bag was conducted in the privacy of the principal’s conference room. Only school officials, no students, were present.
More importantly, the search was presumably limited in good faith to actions necessary to uncover a metal object like a pistol. Such a search would not include an intentional hunt for other contraband, although if discovered, such items need not be ignored. For example, such a search would not entail reading written materials, scrutinizing photographs, activating cellphones, or inspecting small pockets, crevices, wallets, containers, or purses too small to harbor a gun. Understood in this manner, the search of K.P.’s book bag appears no more intrusive than the search that occurs when a traveler brings a suit-ease into the passenger compartment of an airliner, an attorney carries her brief case into a courtroom, a commuter totes a shopping bag on the New York City subway, or a citizen carts a box of petitions to his Senator at the State Capital.
In the Fourth Amendment context of special needs searches, examination of personal effects similar to the search of KP.’s book bag have passed constitutional muster for airports, courthouses, government buildings, and public transportation, with some of the highest courts in the land characterizing such searches as “minimally intrusive.” See, e.g., United States v. Aukai, 497 F.3d 955, 962 (9th Cir.2007) (en banc) (holding the escalating intrusiveness of airport screen search from metal detector, to pat down, to emptying and searching pockets was “minimally intrusive”); MacWade v. Kelly, 460 F.3d 260, 273 (2d Cir.2006) (holding that a random visual and manual search of bags and packages carried onto the New York City subway was “minimally intrusive.”); United States v. Hartwell, 436 F.3d 174, 180 (3d Cir.2006) (holding that a search of bags carried onto an airplane was “minimally intrusive”). Although the searches in these cases were not based on individual suspicion, the holdings shed light on the issue of the intrusiveness of the search here. And, *1132 while we may not agree that the intrusiveness of such searches qualifies as minimal, we do find that the search of K.P.’s book bag could be proportionate to the legitimate purpose of detecting a firearm.
In this regard, we note that alternative searches would not be as accurate or safe. Not every school has the budget to buy metal detectors; and detectors can be set off by many innocent metal objects often contained in a book bag like keys, cellphones, pens, coins, and pencil boxes. Frisking the outside of the bag to feel for a firearm would not discover a pistol located between bulky textbooks. Groping the bag could trigger an accidental discharge. Interrogating the suspected student to seek further information solely to justify the search may go nowhere if the child remains resistant and impassive. Summoning parents may prove useless if the parents are unavailable or uncooperative.
On balance, therefore, the intrusiveness of the search at issue was not disproportionate. This analysis is not altered because the search was conducted by a school resource officer assigned full time to work at the school because such an officer is more akin to a school official than an officer on the street and the purpose of the search was to protect students, not to establish guilt. M.D. v. State, 65 So.3d 563, 566-67 (Fla. 1st DCA 2011).
3. Government’s Interest in Conducting the Search.
Finally, when judging the reasonableness of the search, courts must consider “the severity of the need” and determine whether the government’s legitimate interest “appears important enough to justify the particular search at hand.” Acton, 515 U.S. at 661, 115 S.Ct. 2386. As the Supreme Court has recognized time and again, the government’s interest in protecting juveniles assembled in the classroom under the aegis of governmental authority is “substantial.” T.L.O. 469 U.S. at 339, 105 S.Ct. 733. The danger of a juvenile with a gun in a classroom is different in degree and kind even from the danger of a juvenile with a gun on a street. We have little difficulty holding that firearms at schools represent a heightened danger.
Of course, the vice-principal who supervised the search of K.P.’s book bag did not know for certain at the outset that it contained a gun. The only information he had was the anonymous tip. Here is the nub of the Fourth Amendment problem. Fourth Amendment jurisprudence teaches us to take an objective look at the information used by the government official to initiate a search: the decision to conduct the search must be “justified at its inception.” Terry, 392 U.S. at 20, 88 S.Ct. 1868. In making this determination, however, we must be mindful that the level of reliability required to justify a search is less where the danger is sufficiently heightened and the expectation of privacy is reduced. Both factors occurred here. Thus, a tip in these circumstances — a gun in a classroom — justifies “searches on the basis of information insufficient to justify searches elsewhere.” J.L., 529 U.S. at 274, 120 S.Ct. 1375.
In this regard, while the school official did not know for certain that the book bag contained a gun, he was not operating on a mere “hunch.” The anonymous tip at issue contained indicia of reliability. It accurately identified a student by name, K.P., and the specific school he attended. This aspect of the tip limited the discretion of school officials concerning who could be searched.
This aspect of the tip also demonstrated that the caller knew K.P., and was possibly a student attending the same high school, *1133 thereby “narrowing the likely class of informants” and suggesting that the caller had inside knowledge of KP.’s activities. See id. at 275, 120 S.Ct. 1375 (Kennedy, J., concurring) (“It seems appropriate to observe that a tip might be anonymous in some sense yet have certain other features, either supporting reliability or narrowing the likely class of informants, so that the tip does provide the lawful basis for some police action”) (emphasis added). Next, school officials acted on the tip before it could become stale. Finally, the fact that the tipster contacted a gun bounty program, which offered monetary rewards to members of the community who report the whereabouts of illegal firearms, suggests that the caller had an incentive to offer an accurate report.
Given the reduced expectation of privacy, the relatively-moderate intrusiveness of search, the gravity of the threat, and the consequent reduced level of reliability necessary to justify a protective search, the decision to search KP.’s book bag was reasonable. Admittedly, the tip at issue in this case may not be sufficient to have justified a stop and frisk of K.P. for weapons on a public street (much less an outright search of his book bag) because it may not contain sufficient indicia of reliability reflecting that K.P. was actually carrying a firearm. But the circumstances supported reasonable suspicion of wrongdoing in the context of preventing the threat of gun violence in a classroom.
CONCLUSION
“[W]hen the government acts as guardian and tutor [of students in school] the relevant question is whether the search is one that a reasonable guardian and tutor might undertake.” Acton, 515 U.S. at 666, 115 S.Ct. 2386. An anonymous tip that a named student has a gun in school is not something that school administrators may lightly ignore. It is not a matter that warrants no response. Nor is it a matter that must await further developments before school officials address the threat. Considering the totality of the circumstances, the conclusion appears inescapable that a reasonable guardian and tutor of a group of school children might well conduct a search of the student’s book bag to address such a substantial threat to the children assembled at school.
Affirmed.
SHEPHERD, C.J., concurs.

. See, e.g., United States v. Holloway, 290 F.3d 1331, 1339 (11th Cir.2002), cert. denied, 537 U.S. 1161, 123 S.Ct. 966, 154 L.Ed.2d 897 (2003) (upholding the fruits of an investigative detention and search of individuals on a front porch based upon anonymous tip that shots had been fired: "when an emergency is reported by an anonymous caller, the need for immediate action may outweigh the need to verify the reliability of the caller”); People v. Wells, 38 Cal.4th 1078, 45 Cal.Rptr.3d 8, 136 P.3d 810, 815 (2006), cert. denied, 550 U.S. 937, 127 S.Ct. 2246, 167 L.Ed.2d 1096 (2007) (holding that an uncorroborated, anonymous report of a possibly intoxicated driver "weav *1127 ing all over the roadway” justified an investigatory detention).

. Under the rubric of "special needs” searches, where the discretion of government officials is strictly circumscribed and the government's interest in the search is particularly heightened, a search may qualify as reasonable under the Fourth Amendment without any individualized suspicion. See, e.g., Cassidy v. Chertoff, 471 F.3d 67, 83 (2d Cir.2006) (upholding the search of vehicles and luggage on commuter ferries because of the high risk that they might be targets of terrorist attacks); U.S. v. Edwards, 498 F.2d 496, 500 (2d Cir.1974) (holding that the search of carry-on luggage at airports meets the test of reasonableness because of the "enormous dangers to life and property from terrorists, ordinary criminals, or the demented”).

. In an important sense, the school searches at issue in T.L.O. and Acton are at almost opposite ends of the spectrum of permissible searches. Whereas the T.L.O. search was based on individualized suspicion, the Acton search involved no individualized suspicion. We do not mean to suggest any false equivalency between these searches. To the contrary, the searches are different in regards to their nature, potential for abuse, and safeguards required to pass Fourth Amendment muster. Consistent across both cases, however, is the Fourth Amendment analysis used by the Court which involved balancing the expectation of privacy at issue, the intrusiveness of the search, and the government's interest.

. The worst such incident occurred at the Virginia Polytechnic Institute and State University at Blacksburg, Virginia, on April 16, 2007, when a student shot and killed thirty-two students and wounded seventeen others. But focusing only on middle and high schools, other incidents include, but are not limited to, the following:
1) On October 21, 2013, at Sparks Middle School in Sparks, Nevada, a student at the school shot and wounded two twelve-year-old students, and then shot and killed a teacher and himself.
2) On December 14, 2012, at Sandy Hook Elementary School in Newtown, Connecticut, an adult shooter invaded the campus and killed twenty children and six adult staff members.
3) On February 27, 2012, at Chardon High School in Chardon, Ohio, a student opened fire, killing one student and wounding four others.
4) On January 5, 2011, at Millard South High School in Omaha, Nebraska, a student shot and killed the vice-principal, wounded the principal, and killed himself.
5) On February 5, 2010, at Discovery Middle School in Madison, Alabama, a student shot and killed another student in the hallway.
6) On October 2, 2006, at the West Nickel Mines School in Nickel Mines, Pennsylvania, a shooter invaded a schoolhouse, released the male students, shot and killed five female students, and injured five others.
7) On March 21, 2005, at Red Lake High School on the Red Lake Indian Reservation in Minnesota, a student fatally shot five students, a teacher, and a guard, and wounded seven others before committing suicide.
8) On March 5, 2001, at Santana High school in Santee, California, a student shot and killed two fellow students and wounded thirteen others.
9) On April 20, 1999, at Columbine High School in Columbine, Colorado; two students opened fire, killing twelve students, one teacher, and wounding twenty-four others.
10) On March 24, 1998, at Westside Middle School in Jonesboro, Arkansas, two middle school students opened fire, killing four students, a teacher, and wounding ten others.
11) On January 17, 1989 in Stockton, California, an ex-student attacked a crowded school playground, killing five children and wounding twenty-nine others.
See Timeline: Deadliest U.S. Mass Shootings, Los Angeles Times (Jun. 7, 2013), http:// timelines.latimes.com/deadliest-shooting-rampages/.